NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12043


COMMONWEALTH  vs.  MICHELLE CARTER.



Suffolk.     April 7, 2016. - July 1, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.



Homicide.  Youthful Offender Act.  Grand Jury.  Evidence, Grand
     jury proceedings.  Practice, Criminal, Grand jury
     proceedings.




     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on October 22, 2015.

     The case was reported by Botsford, J.


     Dana Alan Curhan (Joseph P. Cataldo with him) for the
defendant.
     Shoshana E. Stern, Assistant District Attorney (Katie Cook
Rayburn, Assistant District Attorney, with her) for the
Commonwealth.
     Eva G. Jellison & David J. Nathanson, for Youth Advocacy
Division of the Committee for Public Counsel Services & another,
amici curiae, submitted a brief.


     CORDY, J.  On February 6, 2015, the defendant, Michelle

Carter, was indicted as a youthful offender under G. L. c. 119,

§ 54, on a charge of involuntary manslaughter after she, at the

age of seventeen, encouraged Conrad Roy (the victim), then eighteen years of age, to commit suicide. To indict a juvenile as a youthful offender, the grand jury must hear evidence establishing probable cause that (1) the juvenile is between the ages of fourteen and eighteen at the time of the underlying offense; (2) the underlying offense, if committed by an adult, would be punishable by imprisonment in State prison; and (3) the underlying offense involves the infliction or threat of serious bodily harm. G. L. c. 119, § 54. The defendant moved in the Juvenile Court to dismiss the youthful offender indictment, arguing that the Commonwealth failed to present the grand jury with sufficient evidence of involuntary manslaughter and that the defendant's conduct did not involve the infliction or threat of serious bodily harm. The motion was denied.

The principal question we consider in this case is whether the evidence was sufficient to warrant the return of an indictment for involuntary manslaughter where the defendant's conduct did not extend beyond words. We conclude that, on the evidence presented to the grand jury, the verbal conduct at issue was sufficient and, because a conviction of involuntary manslaughter is punishable by imprisonment in State prison and inherently involves the infliction of serious bodily harm, the grand jury properly returned an indictment under the youthful

offender statute.  Accordingly, we affirm the order of the Juvenile Court.[1]

1.  <u>Background</u>.  The grand jury heard evidence from four witnesses over the course of three days.  That evidence, viewed in the light most favorable to the Commonwealth, see <u>Commonwealth</u> v. <u>Moran</u>, 453 Mass. 880, 885 (2012), included the following:

On the afternoon of July 13, 2014, an officer with the Fairhaven police department located the deceased in his truck, parked in a store parking lot.  The medical examiner concluded that the victim had died after inhaling carbon monoxide that was produced by a gasoline powered water pump located in the truck.  The manner of death was suicide.

The victim had been receiving treatment for mental health issues since 2011.  In 2013, the victim attempted to commit suicide by overdosing on acetaminophen.  A friend saved his life by contacting emergency services.

During the course of the investigation into the victim's suicide, a police review of his recent electronic communications caused them to further explore his relationship with the defendant.  The victim and the defendant met in 2011 and had been dating at various times during that period, including at

---

[1] We acknowledge the amicus brief submitted by the Youth Advocacy Division of the Committee for Public Counsel Services and the American Civil Liberties Union of Massachusetts.

the time of the victim's death.  Because they did not live in
the same town, the majority of their contact took place through
the exchange of voluminous text messages and cellular telephone
calls.[2]  The grand jury heard testimony and were presented with
transcripts concerning the content of those text messages in the
minutes, days, weeks, and months leading up to the defendant's
suicide.  The messages revealed that the defendant was aware of
the victim's history of mental illness, and of his previous
suicide attempt, and that much of the communication between the
defendant and the victim focused on suicide.  Specifically, the
defendant encouraged the victim to kill himself,[3] instructed him

---

[2] In a written memorandum of decision, the judge stated
that, although the defendant and the victim rarely were in the
same physical location, "[t]he rapidity of the[ir] electronic
exchanges was almost immediate, similar to a conversation."

[3] On July 8, 2014, between 8:09 P.M. and 8:18 P.M., the
defendant and victim exchanged the following text messages:

Defendant:  "So are you sure you don't wanna [kill
yourself] tonight?"

Victim:  "what do you mean am I sure?"

Defendant:  "Like, are you definitely not doing it
tonight?"

Victim:  "Idk yet I'll let you know"

Defendant:  "Because I'll stay up with you if you wanna do
it tonight"

Victim:  "another day wouldn't hurt"

as to when and how he should kill himself,[4] assuaged his concerns

over killing himself,[5] and chastised him when he delayed doing

---

D<u>efendant</u>:  "You can't keep pushing it off, tho, that's all you keep doing"

[4] The defendant helped the victim determine the method he eventually used to kill himself.  On July 7, 2014, between 10:57 <u>P.M</u>. and 11:04 <u>P.M</u>., they exchanged the following text messages:

D<u>efendant</u>:  "Well there's more ways to make CO.  Google ways to make it. . . "

V<u>ictim</u>:  "Omg"

D<u>efendant</u>:  "What"

V<u>ictim</u>:  "portable generator that's it"

On July 11, 2014, at 5:13 <u>P.M</u>., the defendant sent the victim the following text message:  " . . . Well in my opinion, I think u should do the generator because I don't know much about the pump and with a generator u can't fail"

On July 12, 2014, between 4:25 <u>A.M</u>. and 4:34 <u>A.M</u>., they exchanged the following text messages:

D<u>efendant</u>:  "So I guess you aren't gonna do it then, all that for nothing"

D<u>efendant</u>:  "I'm just confused like you were so ready and determined"

V<u>ictim</u>:  "I am gonna eventually"

V<u>ictim</u>:  "I really don't know what I'm waiting for. .  but I have everything lined up"

D<u>efendant</u>:  "No, you're not, Conrad.  Last night was it. You keep pushing it off and you say you'll do it but u never do. Its always gonna be that way if u don't take action"

D<u>efendant</u>:  "You're just making it harder on yourself by pushing it off, you just have to do it"

Defendant:  "Do u wanna do it now?"

Victim:  "Is it too late?"

Victim:  "Idkk it's already light outside"

Victim:  I'm gonna go back to sleep, love you I'll text you tomorrow"

Defendant:  "No?  Its probably the best time now because everyone's sleeping.  Just go somewhere in your truck.  And no one's really out right now because it's an awkward time"

Defendant:  "If u don't do it now you're never gonna do it"

Defendant:  "And u can say you'll do it tomorrow but you probably won't"

[5] During the evening of July 11, 2014, and morning of July 12, 2014, the victim and the defendant exchanged the following text messages:

Victim:  "I'm just to sensitive.  I want my family to know there was nothing they could do.  I am entrapped in my own thoughts"

Victim:  "like no I would be happy if they had no guilt about it.  because I have a bad feeling tht this is going to create a lot of depression between my parents/sisters"

Victim:  "i'm overthinking everything. . fuck.  I gotta stop and just do it"

Defendant:   "I think your parents know you're in a really bad place.  Im not saying they want you to do it, but I honestly feel like they can except it.  They know there's nothing they can do, they've tried helping, everyone's tried.  But there's a point that comes where there isn't anything anyone can do to save you, not even yourself, and you've hit that point and I think your parents know you've hit that point.  You said you're mom saw a suicide thing on your computer and she didn't say anything.  I think she knows it's on your mind and she's prepared for it"

Defendant:  Everyone will be sad for a while, but they will get over it and move on.  They won't be in depression I won't let that happen.  They know how sad you are and they know that you're doing this to be happy, and I think they will understand and accept it.  They'll always carry u in their hearts"

. . .

Victim:  "i don't want anyone hurt in the process though"

Victim:  "I meant when they open the door, all the carbon monoxide is gonna come out they can't see it or smell it. whoever opens the door"

Defendant:  "They will see the generator and know that you died of CO. . . ."

. . .

Victim:  "hey can you do me a favor"

Defendant:  "Yes of course"

Victim:  "just be there for my family :)"

Defendant:  "Conrad, of course I will be there for your family.  I will help them as much as I can to get thru this, ill tell them about how amazing their son/brother truly was"

. . .

Victim:  "Idk I'm freaking out again"

Victim:  I'm overthinking"

Defendant:  "I thought you wanted to do this.  The time is right and you're ready, you just need to do it!  You can't keep living this way.  You just need to do it like you did last time and not think about it and just do it babe.  You can't keep doing this every day"

Victim:  "I do want to. but like I'm freaking for my family.  I guess"

Victim:  "idkkk"

so.[6]  The theme of those text messages can be summed up in the

phrase used by the defendant four times between July 11 and July

---

Defendant:  "Conrad.  I told you I'll take care of them.
Everyone will take care of them to make sure they won't be alone
and people will help them get thru it.  We talked about this,
they will be okay and accept it.  People who commit suicide
don't think this much and they just do it"

[6] At various times between July 4, 2014, and July 12, 2014,
the defendant and the victim exchanged several text messages:

Defendant:  "You're gonna have to prove me wrong because I
just don't think you really want this.  You just keeps pushing
it off to another night and say you'll do it but you never do"

. . .

Defendant:  "SEE THAT'S WHAT I MEAN.  YOU KEEP PUSHING IT
OFF!  You just said you were gonna do it tonight and now you're
saying eventually. . . ."

. . .

Defendant:  "But I bet you're gonna be like 'oh, it didn't
work because I didn't tape the tube right or something like
that' . . . I bet you're gonna say an excuse like that"

. . .

Defendant:  "Do you have the generator?"

Victim:  "not yet lol"

Defendant:  "WELL WHEN ARE YOU GETTING IT"

. . .

Defendant:  "You better not be bull shiting me and saying
you're gonna do this and then purposely get caught"

. . .

Defendant:  "You just need to do it Conrad or I'm gonna get
you help"

12, 2014 (the day on which the victim committed suicide): "You just [have] to do it."

Cellular telephone records that were presented to the grand jury revealed that the victim and defendant also had two cellular telephone conversations at the time during which police believe that the victim was in his truck committing suicide.[7] The content of those cellular telephone conversations is only available as reported by the defendant to her friend, Samantha Boardman. After the victim's death, the defendant sent a text message to Boardman explaining that, at one point during the

---

Defendant: "You can't keep doing this everyday"

Victim: "Okay I'm gonna do it today"

Defendant: "Do you promise"

Victim: "I promise babe"

Victim: "I have to now"

Defendant: "Like right now?"

Victim: "where do I go?  :("

Defendant: "And u can't break a promise. And just go in a quiet parking lot or something" (emphasis added).

[7] One call, at 6:28 P.M. on July 12, came from the victim's cellular telephone and the other, at 7:12 P.M., came from the defendant's cellular telephone. Each call lasted over forty minutes.

suicide, the victim got out of his truck because he was "scared," and the defendant commanded him to get back in.[8]

It was apparent that the defendant understood the repercussions of her role in the victim's death.  Prior to his suicide, the defendant sought (apparently unsuccessfully) to have the victim delete the text messages between the two, and after learning that the police were looking through the victim's cellular telephone, the defendant sent the following text message to Boardman:  "Sam, [the police] read my messages with him I'm done.  His family will hate me and I can go to jail." During the investigation, and after cross-referencing the text messages in the defendant's cellular telephone and those in the victim's cellular telephone, the police discovered that the defendant had erased certain text messages between her and the victim.  The defendant also lied to police about the content of her conversations with the victim.  Finally, the defendant acknowledged in a text message to Boardman that she could have stopped the victim from committing suicide:  "I helped ease him into it and told him it was okay, I was talking to him on the

---

[8] The text message to Samantha Boardman, in relevant part, stated:  "Sam, [the victim's] death is my fault like honestly I could have stopped him I was on the phone with him and he got out of the [truck] because it was working and he got scared and I fucking told him to get back in Sam because I knew he would do it all over again the next day and I couldnt have him live the way he was living anymore I couldnt do it I wouldnt let him."

phone when he did it I coud have easily stopped him or called the police but I didn't."

Based on the foregoing evidence, the Commonwealth successfully sought to indict the defendant for involuntary manslaughter, as a youthful offender, asserting that the defendant's wanton or reckless conduct was the cause of the victim's death.  After a judge of the Juvenile Court denied the defendant's motion to dismiss, the defendant filed a petition for relief under G. L. c. 211, § 3.  On February 1, 2016, a single justice of this court reserved and reported the case to the full court.

2.  Discussion.  "Ordinarily, a 'court will not inquire into the competency or sufficiency of the evidence before the grand jury.'"  Commonwealth v. Rex, 469 Mass. 36, 39 (2014), quoting Commonwealth v. Robinson, 373 Mass. 591, 592 (1977).  However, in Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982), we recognized a limited exception for when the grand jury "fail[] to hear any evidence of criminal activity by the defendant."  "At the very least, the grand jury must hear enough evidence to establish the identity of the accused and to support a finding of probable cause to arrest the accused for the offense charged" (footnote omitted).  Rex, supra at 40.  "Probable cause requires sufficient facts to warrant a person of reasonable caution in believing that an offense has been

committed . . . ; this standard requires considerably less than that which is required to warrant a finding of guilt" (citations omitted).  Commonwealth v. Levesque, 436 Mass. 443, 447 (2002).

a.  Involuntary manslaughter.[9]  Involuntary manslaughter can be proved under two theories, either (1) wanton or reckless conduct or (2) wanton or reckless failure to act.  Commonwealth v. Life Care Ctrs. of Am., Inc., 456 Mass. 826, 832 (2010).

---

[9] The Model Jury Instructions on Homicide 73 (2013) define "[i]nvoluntary manslaughter" as "an unlawful killing unintentionally caused by wanton and reckless conduct."  Wanton or reckless conduct

> "is conduct that creates a high degree of likelihood that substantial harm will result to another.  It is conduct involving a grave risk of harm to another that a person undertakes with indifference to or disregard of the consequences of such conduct.  Whether conduct is wanton and reckless depends either on what the defendant knew or how a reasonable person would have acted knowing what the defendant knew.  If the defendant realized the grave risk created by his conduct, his subsequent act amounts to wanton and reckless conduct whether or not a reasonable person would have realized the risk of grave danger.  Even if the defendant himself did not realize the grave risk of harm to another, the act would constitute wanton and reckless conduct if a reasonable person, knowing what the defendant knew, would have realized the act posed a risk of grave danger to another.  It is not enough for the Commonwealth to prove the defendant acted negligently, that is, in a manner that a reasonably careful person would not have acted.  The Commonwealth must prove that the defendant's actions went beyond negligence and amounted to wanton and reckless conduct as . . . defined . . . ."

Id. at 76-79.  The 2016 proposed model jury instructions are substantially similar in content to the 2013 model jury instructions.

The indictment was returned on the basis of the defendant's wanton or reckless conduct.[10]

Wanton or reckless conduct is "intentional conduct . . . involv[ing] a high degree of likelihood that substantial harm will result to another."  Commonwealth v. Pugh, 462 Mass. 482, 496 (2012), quoting Commonwealth v. Welansky, 316 Mass. 383, 399 (1944).  Whether conduct is wanton or reckless is

> "determined based either on the defendant's specific knowledge or on what a reasonable person should have known in the circumstances. . . . If based on the objective measure of recklessness, the defendant's actions constitute wanton or reckless conduct . . . if an ordinary normal [person] under the same circumstances would have realized the gravity of the danger. . . .  If based on the subjective measure, i.e., the defendant's own knowledge, grave danger to others must have been apparent and the defendant must have chosen to run the risk rather than alter [his or her] conduct so as to avoid the act or omission which caused the harm"  (quotations and citations omitted).

Pugh, supra at 496-497.

b.  Sufficiency of the evidence presented to the grand jury.[11]  The Commonwealth bore the burden of presenting the grand

---

[10] Our case law uses the phrases "wanton and reckless conduct" and "wanton or reckless conduct" interchangeably.  See, e.g., Commonwealth v. Pugh, 462 Mass. 482, 496-497 (2012).

[11] Before we consider whether the grand jury heard testimony sufficient to warrant an indictment against the defendant for involuntary manslaughter, we address her argument that G. L. c. 265, § 13 (punishing involuntary manslaughter), is unconstitutionally vague as applied to her.  Specifically, the defendant argues that no one of ordinary intelligence -- never mind a juvenile -- would understand that encouraging suicide is prosecutable under existing law.

A criminal statute must be "sufficiently explicit to give clear warning as to proscribed activities." Commonwealth v. Orlando, 371 Mass. 732, 734 (1977). "A statute is unconstitutionally vague if men of common intelligence must necessarily guess at its meaning. . . . If a statute has been clarified by judicial explanation, however, it will withstand a challenge on grounds of unconstitutional vagueness" (quotation and citation omitted). Commonwealth v. Crawford, 430 Mass. 683, 689 (2000). "Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment [to the United States Constitution], the [vagueness] doctrine demands a greater degree of specificity than in other contexts" (citation omitted). Commonwealth v. Abramms, 66 Mass. App. Ct. 576, 581 (2006).

The crime the defendant is charged with is neither objectively nor subjectively vague as applied to the defendant. "Manslaughter is a common-law crime that has not been codified by statute in Massachusetts" (citation omitted). Commonwealth v. Rodriquez, 461 Mass. 100, 106 (2011). General Laws c. 265, § 13, does not describe the crime; instead, it sets out only the punishment, while the elements of the crime are created as part of the common law. Under common law, conduct similar to that of the defendant has been deemed unlawful, see Persampieri v. Commonwealth, 343 Mass. 19, 22-23 (1961) (jury warranted in convicting defendant of involuntary manslaughter where he provided wife with gun, taunted her, and encouraged her to commit suicide, resulting in her killing herself), and it is therefore not objectively vague.

On a subjective basis, the evidence presented by the Commonwealth showed that the defendant was personally aware that her conduct was both reprehensible and punishable:  the defendant asked the victim to delete the text messages between the two of them, deleted several of those messages from her own cellular telephone, and, after police began investigating the victim's cellular telephone, lied about her involvement and told her friend that, if the police uncovered the text messages between her and the victim, she could go to jail.  The charge of involuntary manslaughter is not vague as applied to the defendant.

jury with sufficient evidence to support a finding of probable cause that the defendant's conduct (1) was intentional;[12] (2) was wanton or reckless; and (3) caused the victim's death. Life Care Ctrs. of Am., Inc., 456 Mass. at 832.

The defendant argues that, because she neither was physically present when the victim killed himself nor provided the victim with the instrument with which he killed himself, she did not cause his death by wanton or reckless conduct.[13] She maintains that verbally encouraging someone to commit suicide, no matter how forcefully, cannot constitute wanton or reckless conduct. Effectively, the argument is that verbal conduct can never overcome a person's willpower to live, and therefore cannot be the cause of a suicide. We disagree.

We have never required in the return of an indictment for involuntary manslaughter that a defendant commit a physical act in perpetrating a victim's death.[14] We also never have had

---

[12] Viewed in the light most favorable to the Commonwealth, there was evidence that the defendant intended to pressure the victim into killing himself. The defendant told her friend, Samantha Boardman, that she "couldn't have [the victim] live the way he was living anymore. [She] couldn't do it. [She] wouldn't let him."

[13] Although not physically present when the victim committed suicide, the constant communication with him by text message and by telephone leading up to and during the suicide made the defendant's presence at least virtual.

[14] Physical acts are certainly one means by which the Commonwealth can show the commission prong of involuntary

occasion to consider such an indictment against a defendant on the basis of words alone.  This is not, however, the first time that we have contemplated the charge of involuntary manslaughter against a defendant where the death of the victim is self-inflicted.  See, e.g., Commonwealth v. Atencio, 345 Mass. 627 (1963); Persampieri v. Commonwealth, 343 Mass. 19 (1961).

At issue in Atencio was a "game" of "Russian roulette" played by the two defendants, Atencio and Marshall, and the deceased.  Atencio, supra at 628.  Marshall took the gun first, pointed it at his own head, and pulled the trigger; nothing happened.  Id. at 628-629.  He passed the gun to Atencio, who also pointed the gun at his own head and pulled the trigger, again with no result.  Id. at 629.  Atencio then passed the gun to the deceased; when he pointed it at his own head and pulled the trigger, "[t]he cartridge exploded, and he fell over dead." Id.

In affirming the involuntary manslaughter convictions against both defendants, we reasoned that "the Commonwealth had an interest that the deceased should not be killed by the wanton or reckless conduct of himself and others" (emphasis added). Id.  "Such conduct could be found in the concerted action and

---

manslaughter.  See Pugh, 462 Mass. at 497.  However, the defendant does not point to -- and our research has not uncovered -- any case in which physical acts have been made a prerequisite of involuntary manslaughter.

cooperation of the defendants in helping to bring about the deceased's foolish act," id., as "[i]t would not be necessary that the defendants force the deceased to play or suggest that he play." Id. at 630. We concluded that it did not matter that Atencio was the one who handed the gun to the deceased, as opposed to Marshall, affirming both defendants' convictions. Id. at 630. Indeed, had the deceased been the first to participate in the "game," and killed himself before either Atencio or Marshall touched the gun, his acts would still have been imputable to the defendants. Id. It was, instead, the atmosphere created in the decision to play the "game" that caused the deceased to shoot himself, as there was "mutual encouragement" to participate. Id.

In Persampieri, 343 Mass. at 22, the defendant told his wife that he intended to divorce her. She threatened to commit suicide. Id. The defendant, knowing that the victim had already attempted suicide twice, said she was "chicken -- and wouldn't do it." Id. When she retrieved a .22 caliber rifle, he helped her to load it and handed it to her, noting that the safety was off. Id. With the gun barrel on the floor, the victim struggled to pull the trigger. Id. at 23. The defendant told her that if she took off her shoe she could reach the trigger, at which point she successfully shot and killed herself. Id. We concluded that the jury were warranted in

returning a verdict of involuntary manslaughter based on the theory of wanton or reckless conduct, id., noting that the defendant, "instead of trying to bring [the victim] to her senses, taunted her, told her where the gun was, loaded it for her, saw that the safety was off, and told her the means by which she could pull the trigger. He thus showed a reckless disregard of his wife's safety and the possible consequences of his conduct." Id.

These cases elucidate that, because wanton or reckless conduct requires a consideration of the likelihood of a result occurring, the inquiry is by its nature entirely fact-specific. The circumstances of the situation dictate whether the conduct is or is not wanton or reckless. We need not -- and indeed cannot -- define where on the spectrum between speech and physical acts involuntary manslaughter must fall. Instead, the inquiry must be made on a case-by-case basis.

Here, the particular circumstances of the defendant's relationship with the victim may have caused her verbal communications with him in the last minutes of his life on July 12, 2014, to carry more weight than mere words, overcoming any independent will to live he might have had. It is in those final moments, when the victim had gotten out of his truck, expressing doubts about killing himself, on which a verdict in this case may ultimately turn. In that moment of equivocation,

the victim could have continued to delay his death, perhaps attempting suicide again at a later date, or perhaps seeking treatment; or he could have gotten back into the truck and followed through on his suicide. The grand jury heard that the victim, after the defendant commanded him to "get back in," obeyed, returning to the truck, closing the door, and succumbing to the carbon monoxide.

In our view, the coercive quality of that final directive was sufficient in the specific circumstances of this case to support a finding of probable cause. Those circumstances included the defendant's virtual presence at the time of the suicide, the previous constant pressure the defendant had put on the victim, and his already delicate mental state.[15] In sum, there was ample evidence to establish probable cause that the defendant's conduct was wanton or reckless, under either a subjective or an objective standard. The grand jury could have found that an ordinary person under the circumstances would have realized the gravity of the danger posed by telling the victim, who was mentally fragile, predisposed to suicidal inclinations,

---

[15] As in the case against the husband in Persampieri, the Commonwealth's evidence here shows that the defendant fully understood and took advantage of the victim's fragility. Prior to July 12, 2014, the defendant had helped to plan the victim's suicide, assuaged the victim's guilt about leaving his family, expressed her frustration that the victim had, at various times, delayed killing himself, and threatened to seek mental health treatment for the victim (despite his protestations) if he did not kill himself.

and in the process of killing himself, to get back in a truck filling with carbon monoxide and "just do it." See Levesque, 436 Mass. at 452. And significantly, the grand jury also could have found that the defendant -- the victim's girl friend, with whom he was in constant and perpetual contact -- on a subjective basis knew that she had some control over his actions.[16]

The defendant argues that, even if she was wanton or reckless, her words (spoken when she was miles away from the victim) could not be the cause of the victim's death. Instead, it was his decision to get back in the truck that resulted in his suicide. We are not convinced. Because there was evidence that the defendant's actions overbore the victim's willpower, there was probable cause to believe that the victim's return to the truck after the defendant told him to do so was not "an independent or intervening act" that, as a matter of law, would preclude his action from being imputable to her. See Atencio, 345 Mass. at 629-630. The text messages suggest that the victim had been delaying suicide for weeks; to ignore the influence the defendant had over the victim would be to oversimplify the circumstances surrounding his death. His delay of that suicide and subsequent excuses for such delays were followed by his girl

---

[16] The defendant admitted to Boardman: "I helped ease him into it and told him it was okay, I was talking to him on the phone when he did it I coud have easily stopped him or called the police but I didn't."

friend's disappointment, frustration, and threats to seek unwanted treatment on his behalf.  In sum, we conclude that there was probable cause to show that the coercive quality of the defendant's verbal conduct overwhelmed whatever willpower the eighteen year old victim had to cope with his depression, and that but for the defendant's admonishments, pressure, and instructions, the victim would not have gotten back into the truck and poisoned himself to death.  Consequently, the evidence before the grand jury was sufficient for a finding of probable cause that the defendant, by wanton or reckless conduct, caused the victim's death.[17]

It is important to articulate what this case is not about. It is not about a person seeking to ameliorate the anguish of someone coping with a terminal illness and questioning the value

---

[17] The speech at issue in this case is not protected under the First Amendment to the United States Constitution or art. 16 of the Massachusetts Declaration of Rights because the Commonwealth has a compelling interest in deterring speech that has a direct, causal link to a specific victim's suicide.  See Mendoza v. Licensing Bd. of Fall River, 444 Mass. 188, 197 n.12 (2005) (content-based restrictions on expressive conduct must satisfy "strict scrutiny" standard, meaning government must "demonstrate that the restriction is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end" [citation omitted]); Brown v. Entertainment Merchants Ass'n, 564 U.S. 786, 799 (2011); Washington v. Glucksberg, 521 U.S. 702, 728 (1997) (State "has an unqualified interest in the preservation of human life" [citation omitted]). See also State v. Melchert-Dinkel, 844 N.W.2d 13, 23 (Minn. 2014) (affirming in part constitutionality of statute prohibiting "assist[ing]" suicide as against First Amendment challenge).

of life.  Nor is it about a person offering support, comfort, and even assistance to a mature adult who, confronted with such circumstances, has decided to end his or her life.  These situations are easily distinguishable from the present case, in which the grand jury heard evidence suggesting a systematic campaign of coercion on which the virtually present defendant embarked -- captured and preserved through her text messages -- that targeted the equivocating young victim's insecurities and acted to subvert his willpower in favor of her own.  On the specific facts of this case, there was sufficient evidence to support a probable cause finding that the defendant's command to the victim in the final moments of his life to follow through on his suicide attempt was a direct, causal link to his death.

   3.  <u>Conclusion</u>.[18]  The grand jury were justified in returning an indictment of involuntary manslaughter against the

---

[18] The defendant argues that the indictment is flawed where the grand jurors did not consider the charges from the perspective of a "reasonable juvenile of the same age" standard. Massachusetts currently does not require that a grand jury consider charges based on such a standard.  This issue was not raised below.  See G. L. c. 277, § 47A ("In a criminal case, any defense or objection based upon defects in the institution of the prosecution or in the complaint or indictment, other than a failure to show jurisdiction in the court or to charge an offense, shall only be raised . . . by a motion in conformity with the requirements of the Massachusetts Rules of Criminal Procedure").  There was not an evidentiary hearing on the issue, the judge did not offer any opinion as to the argument's merits, and the arguments presented by the defendant and amici at this stage regarding the impact of juvenile indictments are being

defendant.  Because involuntary manslaughter carries a potential punishment of incarceration in State prison and is inherently a crime that involves the infliction of serious bodily harm,[19] and because the defendant was seventeen years of age at the time of the offense, her indictment as a youthful offender on the underlying involuntary manslaughter charge was also supported by the evidence.  The motion judge's denial of the defendant's motion to dismiss is affirmed.

So ordered.

---

raised for the first time on appeal.  The argument was therefore waived.

[19] The defendant argues that her conduct cannot constitute the infliction or threat of serious bodily harm, as is required for an indictment under the youthful offender statute, G. L. c. 119, § 54.  Having concluded that the grand jury were justified in returning an indictment for involuntary manslaughter, we are convinced that they were also justified in returning such indictment under the youthful offender statute, given that involuntary manslaughter under these circumstances inherently involves the infliction of serious bodily harm.