MARTINS MAINTENANCE, INC., COMMONWEALTH vs., 101 Mass. App. Ct. 186

 
 COMMONWEALTH vs. MARTINS MAINTENANCE, INC. [Note 1] (and two companion cases [Note 2]).

101 Mass. App. Ct. 186
 February 2, 2022 - June 9, 2022

Court Below: Superior Court, Bristol County
Present: Meade, Blake, & Neyman, JJ.

 

Nos. 20-P-1238, 20-P-1239, & 20-P-1240.

Trafficking. Corporation, Criminal responsibility. Agency, Agent's knowledge. Evidence, Record of past knowledge. Probable Cause. Grand Jury. Words, "Labor trafficking."

A Superior Court judge erred in dismissing indictments against the defendant corporation for trafficking of persons for forced services in violation of G. L. c. 265, § 51 (a), where, although the Commonwealth presented insufficient evidence to the grand jury to establish probable cause that the corporation was vicariously liable for an employee's knowing subjection of two victims to perform forced janitorial services, in that the Commonwealth did not show that the employee had authority to act on the corporation's behalf with regard to engaging others to perform such services [192-194], the Commonwealth presented sufficient evidence to establish probable cause to impose criminal liability on the corporation under a collective knowledge theory, in that at least two of the corporation's supervisors had direct and indirect knowledge of the employee's actions, which constituted a statutorily created crime unknown to the common law [194-197]. 

Indictments found and returned in the Superior Court Department on May 14, 2018, August 1, 2018, and August 15, 2018. 

 A motion to dismiss was heard by Thomas F. McGuire, Jr., J. 

 Randall E. Ravitz, Assistant Attorney General, for the Commonwealth.

 J. Richard Ratcliffe (Thomas J. McAndrew also present) for the defendant.

 BLAKE, J. The defendant, Martins Maintenance, Inc., a corporation that provides commercial janitorial services, was indicted for trafficking of persons for forced services in violation of 

 Page 187 

G. L. c. 265, § 51 (a) (labor trafficking). [Note 3] The Commonwealth may establish a corporation's criminal liability under one or both of two theories. The first is a theory of vicarious liability; the second is a theory of collective knowledge. A Superior Court judge found that the Commonwealth presented insufficient evidence to the grand jury to establish probable cause under either theory of liability, and dismissed the indictments. The Commonwealth appealed. We conclude that there was insufficient evidence presented to the grand jury to establish probable cause under the vicarious liability theory, but that there was sufficient evidence to establish probable cause that the company was profiting from labor trafficking under the collective knowledge theory. Accordingly, we reverse the orders dismissing the labor trafficking indictments.

 Background. The indictments arose from the alleged labor trafficking of two women by Fernando Roland, an employee of Martins Maintenance, Inc. (Martins or the company). [Note 4] Because the sufficiency of evidence of the labor trafficking is directly related to what Martins knew or should have known about Roland's conduct, we set forth the company's ownership scheme and supervisory structure in some detail, in the light most favorable to the Commonwealth. See Commonwealth v. Stirlacci, 483 Mass. 775, 780 (2020).

 1. Martins Maintenance, Inc. Martins is a family-owned business that provided commercial janitorial services throughout New England and Pennsylvania during the relevant time period. Manny Martins, Sr., the company's president, founded Martins, but his children, Manny Martins, Jr. and Lisa Martins Caldarone, ran the company. [Note 5] Manny Jr. was vice president of operations and was responsible for, among other things, overseeing all company operations, supervising site inspections, and reviewing employee training materials. Lisa was the director of administration and was responsible for, among other things, approving employee payroll correction forms when employees were overpaid or 

 Page 188 

underpaid. 

 Jose Felix was the director of operations (also known as a regional operations manager). He oversaw the provision of all services, supervised area managers and supervisors, performed site inspections, and took steps to correct problems. Felix made day-to-day management decisions, but he did not have authority to make financial decisions. Depending on the issue, Felix reported to Manny Sr. or Manny Jr. Felix supervised Brandon Araujo who was an area/regional account manager and responsible for the management of multiple job sites. Araujo was instructed by Manny Jr., Lisa, and Felix to "[d]o what you have to do to get the job done," because Manny Jr. "[didn't] care who the hell clean[ed] the place, [] just get the place cleaned." 

 2. The janitors. Martins subcontracted janitors through various entities to provide cleaning services to its clients, instead of hiring them as company employees, in an effort to avoid compliance with certain employment laws. Despite this arrangement, Martins advertised janitorial job openings with the company's office telephone number, received job applications, conducted interviews, extended offers, maintained personnel records, provided training, established rates of pay including raises, required all janitors to wear company-branded uniforms, made worksite assignments, provided cleaning supplies, implemented a time-keeping method for hours worked, supervised janitors, and prepared employment verification letters. 

 In its proposals to clients, Martins described its recruitment, hiring, and training of janitors. Notably, Martins represented that it conducted background checks that included confirmation of an applicant's eligibility for employment, and verification of an employee's "green card" status both at the beginning of and periodically during their employment. Nevertheless, Manny Jr. sent janitors who "weren't legal" to one particular subcontractor entity. Because these workers did not have Social Security numbers, Martins's management directed the human resource manager [Note 6] to "guess" or put in random numbers, and no personnel files were created for them. 

 Martins used a computerized system to track janitors' time. Janitors were required to punch in and out using a work site telephone, an employee code, and a location code. Personal cell phone use at a job site was prohibited. 

 Page 189 

 3. Fernando Roland. Fernando Roland worked as a janitor. [Note 7] As detailed infra, the management team was aware that Roland did not properly punch in and out of work; punched in without using the work site telephone; habitually punched in at two work sites simultaneously; reported an impossibly high number of cleaning hours; [Note 8] and had other people (the victims) at work sites with him, all in violation of company policies. Company records demonstrate that Roland punched in to one work site from another location forty-one times, and punched in at two different locations at the same time on at least fourteen occasions. 

 The company owners and upper management were aware of numerous issues with Roland. For example, Lisa instructed Araujo, Roland's direct supervisor, to address performance issues with Roland, and issue a final warning to him. Araujo did not do so because he felt badly for Roland, but did give him a verbal warning. Roland was told that on one hand, there were too many hours submitted for his work; and that on the other, no one person could clean an entire building alone as he reported doing. Araujo documented the interaction by writing a "Record of Verbal Warning." It said Araujo would discuss issues with Manny Jr. and Felix. In addition, during unannounced work site visits, Araujo found Roland with the victims, in violation of company policy. On one occasion, a company client called Araujo to report that Roland was at the work site with a "lady." 

 When confronted, Roland always had an excuse, and promised it would not happen again. Although Araujo thought Roland was "subbing people in and out for him," he was aware that Manny Jr. just wanted the job done, and took no further action. Although Roland continued to work for Martins, Lisa and Felix removed him from certain accounts. 

 4. The alleged victims. In April 2016, S.D., then age twenty-two, moved to New Bedford from Senegal in hopes of attending school. Roland arranged for S.D. to stay with his girlfriend and her son; he also took possession of her important papers, including her passport. [Note 9] Within weeks, Roland arranged for S.D. to marry his girlfriend's son, claiming that it would help her bring the rest of her family to the United States. S.D. reluctantly 

 Page 190 

complied. 

 Almost immediately, Roland took S.D. to his assigned work sites for her to clean. He provided her with and instructed her to wear a Martins-branded shirt; [Note 10] he directed her to punch in using his name or the name Isaura Monteiro (another janitor). He also told S.D. that, if asked, she was to identify herself as "Monteiro." S.D. typically worked five to seven days per week. Although her hours varied, S.D. worked nights, from between 5 P.M. and 8 P.M. until between 5 A.M. and 8 A.M. Each week, Roland drove with S.D. to pick up his paycheck and a check payable to Monteiro. Initially Roland gave S.D. ninety dollars the first week and then no money for several weeks; eventually he gave her between ninety dollars and $120 per week, but he deducted money for rent and transportation. In the end, S.D. received between twenty to twenty-five dollars for herself.

 Three times at work sites, Juvenio Silva, [Note 11] a company account manager who also supervised Roland, met S.D., who he knew was not Monteiro. Roland introduced S.D. to Silva as "Mijo." When Silva asked S.D. to sign a company form, she signed her real name. [Note 12] When Silva asked S.D. if she had a "green card," consistent with Roland's instructions, she said "it was in process." Silva then told her to work under someone else's name. Once Manny Jr. traveled to a work site in response to a client complaint and found Roland with S.D. Roland introduced her to Manny Jr. as "Mijo." 

 In April 2017, Roland recruited A.C., a then sixty-two year old immigrant who did not speak English, to clean. Roland gave A.C. a Martins-branded shirt, drove her to the work sites, and punched her in and out under his name or the name of his daughter (a Martins employee). A.C. worked nights, forty hours per week. Roland controlled A.C.'s wages, sometimes paid her rent, and sometimes provided her with no more than twenty dollars per week. As he did with S.D., Roland took possession of A.C.'s passport and other important papers. Both Araujo and Silva met A.C. at work sites, where she was introduced by Roland as his daughter, notwithstanding her advanced age. 

 Page 191 

 Discussion. "[G]enerally a court will not inquire into the competency or sufficiency of the evidence before the grand jury" (quotation and citation omitted). Commonwealth v. McCarthy, 385 Mass. 160, 161-162 (1982). Extraordinary circumstances that may warrant a judicial inquiry into grand jury proceedings include "when it is unclear that sufficient evidence was presented to the grand jury to support a finding of probable cause to believe that the defendant committed the offense charged in the indictment." Commonwealth v. Freeman, 407 Mass. 279, 282 (1990). 

 We review the evidence underlying the grand jury indictments in the light most favorable to the Commonwealth. See Stirlacci, 483 Mass. at 780. "[T]he grand jury must hear enough evidence to . . . support a finding of probable cause to arrest the accused for the offense charged." Commonwealth v. Carter, 474 Mass. 624, 630 (2016), quoting Commonwealth v. Rex, 469 Mass. 36, 40 (2014). Probable cause "requires considerably less than that which is required to warrant a finding of guilt." Carter, supra, quoting Commonwealth v. Levesque, 436 Mass. 443, 447 (2002). "It requires 'sufficient facts to warrant a person of reasonable caution in believing that an offense has been committed,' not proof beyond a reasonable doubt." Commonwealth v. Buono, 484 Mass. 351, 362 (2020), quoting Stirlacci, supra. Our review is de novo. See Commonwealth v. Ilya I., 470 Mass. 625, 627 (2015). In order for an indictment to stand, the grand jury must be presented with evidence on each of the elements of the offense charged. See Commonwealth v. Moran, 453 Mass. 880, 884 (2009).

 Labor trafficking, under G. L. c. 265, § 51 (a), provides that, 

"[w]hoever knowingly: (i) subjects, or attempts to subject, another person to forced services, [Note 13] or recruits, entices, harbors, transports, provides or obtains by any means, or 

 Page 192 

attempts to recruit, entice, harbor, transport, provide or obtain by any means, another person, intending or knowing that such person will be subjected to forced services [(forced labor theory)]; or (ii) benefits, financially or by receiving anything of value, as a result of a violation of clause (i) [(profiting theory)], shall be guilty of trafficking of persons for forced services."

There are no cases addressing corporate liability under the labor trafficking statute. [Note 14] 

 Here, the Commonwealth indicted Martins under G. L. c. 265, § 51 (a), and contends that the company may be criminally liable under either or both clause (i) and clause (ii) of the statute. An element of the offense under both clauses is knowledge and the Commonwealth may "meet its burden with respect to a corporate defendant charged with a statutorily-created crime having a mens rea of knowledge by showing either (1) collective corporate knowledge or (2)" vicarious liability. Commonwealth v. Springfield Terminal Ry. Co., 80 Mass. App. Ct. 22, 32 (2011). As presented to the grand jury, with regard to the forced labor theory, the Commonwealth predicated Martins's liability on the commission of a complete crime by a single employee or agent and principles of vicarious liability. See id. at 30-32 & n.14. As to the profiting theory, the Commonwealth predicated liability on the collective knowledge theory. Under this theory, Martins may be criminally liable, through the collective knowledge of its employees or agents when the charge is a statutorily created crime unknown at common law, and the mens rea is mere knowledge. See id. at 30-34 & nn.15-19. We address each theory in turn.

 1. Vicarious liability. The Commonwealth was required to present evidence to the grand jury that Roland knowingly forced the victims to perform services under circumstances that make Martins vicariously liable for Roland's crimes. [Note 15] See 

 Page 193 

Commonwealth v. Beneficial Fin. Co., 360 Mass. 188, 264-265 (1971), cert. denied, 407 U.S. 914 (1972). Under the vicarious liability theory, the Commonwealth must prove "(1) that an individual committed a criminal offense; (2) that at the time of committing the offense, the individual 'was engaged in some particular corporate business or project'; and (3) that the individual had been vested by the corporation with the authority to act for it, and on its behalf, in carrying out that particular corporate business or project when the offense occurred" (citation omitted). Commonwealth v. Angelo Todesca Corp., 446 Mass. 128, 134 (2006). See Springfield Terminal Ry. Co., 80 Mass. App. Ct. at 31 n.14. 

 The first requirement is not at issue. The Commonwealth presented sufficient evidence to the grand jury to establish probable cause to believe that Roland knowingly subjected the victims to forced services, and Martins appropriately does not contend otherwise. [Note 16] As to the second requirement, the Commonwealth must demonstrate that Roland was engaged in a corporate business or project when he trafficked the victims. See Angelo Todesca Corp., 446 Mass. at 134. In this context, a corporate project is a component of the business or operation of the corporation or of a particular sphere of the corporation's business. See Beneficial Fin. Co., 360 Mass. at 270. Viewing the evidence in the light most favorable to the Commonwealth, the commercial cleaning services performed by the victims under the direction of Roland [Note 17] were properly characterized as a corporate project. That Roland recruited and groomed his victims primarily on his personal time is of no moment. This is particularly true where here, the unlawful conduct was ongoing; it was not an isolated event.

 The third requirement requires evidence that Roland was authorized by Martins to act with respect to the services he forced his victims to perform. See Beneficial Fin. Co., 360 Mass. at 256, 280-281. Although not exhaustive, relevant factors to assess authority to act include "(1) the extent of control and authority exercised by the individual over and within the corporation; (2) the extent and manner to which corporate funds were used in the 

 Page 194 

crime; [and] (3) a repeated pattern of criminal conduct tending to indicate corporate toleration or ratification of the agent's acts" (footnotes omitted). Id. at 280-281. Although we think the question is a close one, we note that Roland was an employee, and not a supervisor. To the extent that Roland supervised the victims, he did so of his own accord, and as part of his criminal scheme. He did not do so as a result of any authority vested in him by Martins. To be sure, Roland was a low-level employee hired to clean with no explicit or implicit control or authority over others. That the company trained Roland, and provided him with uniforms in various sizes and cleaning supplies, is insufficient to demonstrate that Roland was authorized to act for Martins beyond the janitorial services that he was hired to perform. Because the Commonwealth presented insufficient evidence to the grand jury to establish probable cause that Roland had authority to act on behalf of Martins with regard to engaging others to perform janitorial services, the corporation cannot be liable under a vicarious liability theory. 

 2. Collective knowledge. A corporate defendant's criminal liability is not limited to vicarious liability. Under the second theory of corporate liability, the Commonwealth may establish a corporation's knowledge, for purposes of imposing criminal liability, through the collective knowledge of the corporate defendant's agents or employees when the charge is a statutorily created crime unknown to the common law, and the mens rea required is mere knowledge. [Note 18] See Springfield Terminal Ry. Co., 80 Mass. App. Ct. at 32 & n.17. Under this theory, Martins may be criminally responsible if it knowingly benefited financially or received anything of value, [Note 19] as a result of Roland's labor trafficking of the victims. See G. L. c. 265, § 51 (a) (ii). "When used in a criminal statute, the word 'knowingly' . . . 'imports a perception of the facts requisite to make up the crime.'" Commonwealth v. McGhee, 472 Mass. 405, 415 (2015), quoting Commonwealth v. Altenhaus, 317 Mass. 270, 273 (1944). Because Martins 

 Page 195 

is a corporation, its mental state depends on the knowledge of its agents. See United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 848 F.3d 366, 372 (5th Cir. 2017). "[T]he corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly" (citation omitted). United States v. Bank of New England, N.A., 821 F.2d 844, 856 (1st Cir.), cert. denied, 484 U.S. 943 (1987). Moreover, the Commonwealth does not need to prove that an employee's criminal "conduct was performed, authorized, ratified, adopted, or tolerated by corporate officials or managers" (quotation and citation omitted). Angelo Todesca Corp., 446 Mass. at 133.

 As to the first aspect of the collective knowledge doctrine, labor trafficking must be a statutorily created crime unknown to the common law. See Springfield Terminal Ry. Co., 80 Mass. App. Ct. at 32. The crime of labor trafficking was first established through an Act relative to the commercial exploitation of people, St. 2011, c. 178, § 23. Notwithstanding, the company contends that labor trafficking is not a crime unknown to the common law, because the offense of peonage was recognized by common law. We are not persuaded.

 Peonage is defined as the "compulsory service in payment of a debt." Bailey v. Alabama, 219 U.S. 219, 242 (1911). It is distinct from labor trafficking because the latter offense requires proof that the services were forced in one of several specific ways; the offense of peonage does not. Cf. Commonwealth v. Valliere, 437 Mass. 366, 371 (2002) (crimes are not same offense where each requires proof of element other does not). Compare G. L. c. 265, §§ 49, 51, with Clyatt v. United States, 197 U.S. 207, 215 (1905). Peonage is tantamount to involuntary servitude; it is based on the indebtedness of the "peon" to the "master." See Clyatt, supra. Martins cites no decision, and nor have we found one, that recognizes peonage as a common-law crime in Massachusetts. [Note 20] The fact that Federal courts recognize the common-law crime of peonage with its minimal similarities to the statutory offense of labor trafficking does not preclude the application of the collective knowledge theory. See Springfield Terminal Ry. Co., 80 Mass. App. Ct. at 30-34 & nn.15-19. 

 We next turn to the second aspect of the collective knowledge 

 Page 196 

doctrine -- the company's knowledge. In the civil context, "notice to a corporation's agent is notice to the corporation." Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C., 425 Mass. 63, 66 (1997). See Restatement (Third) of Agency § 5.03 (2006). There is no requirement that the person with knowledge be a "central figure" in the company; the person whose knowledge is to be imputed must have only some relationship with the company. See United States v. Josleyn, 206 F.3d 144, 159 (1st Cir. 2000). Here, we have both. At least two company supervisors, Felix and Araujo, had direct knowledge of Roland's actions. Felix and Araujo reported their concerns to Manny Jr. and Lisa. "When an agent acquires knowledge in the scope of [his] employment, the principal . . . is held to have constructive knowledge of that information." DeVaux v. American Home Assur. Co., 387 Mass. 814, 818 (1983), citing Bockser v. Dorchester Mut. Fire Ins. Co., 327 Mass. 473, 477-478 (1951). We see no reason why this concept should not apply here. Although "[c]orporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components," it is the aggregate of those components that "constitutes the corporation's knowledge of a particular operation." Bank of New England, N.A., 821 F.2d at 856. "[A] corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual who then would have comprehended its full import. Rather the corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly" (citation omitted). Id. 

 Here, the grand jury heard sufficient evidence that Manny Jr. and Lisa had direct and indirect knowledge of Roland's actions. This included the fact that S.D. worked under both Roland's name and the name Isaura Monteiro; Silva (Roland's supervisor) met S.D. three times, and knew that she was not Monteiro. In addition, after S.D. signed her real name on a company form, Silva asked S.D. if she had a "green card" to which she replied that it was "in process"; he then told S.D. to work under a different name. Company records showed that Roland punched in to one work site from another location forty-one times, punched in at two different locations at the same time at least fourteen times, reported an impossibly high number of cleaning hours, and had other people with him at work sites. In fact, Araujo believed that Roland was "subbing people in and out for him." Araujo took 

 Page 197 

no action because they were accomplishing management's objective to just get the work done. Accordingly, there was sufficient probable cause to indict Martins for labor trafficking. This is particularly true where, as here, the company's "knowledge of a particular fact may be inferred from [its] deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact" (citation omitted). Commonwealth v. Mussari, 97 Mass. App. Ct. 647, 656 (2020). See Commonwealth v. Hyde, 88 Mass. App. Ct. 761, 769 n.9 (2015) (knowledge may be inferred if individual intentionally closed eyes to what was obvious). 

 We also reject the company's argument that it cannot be charged with knowledge of Roland's crimes because of the faithless agent doctrine. That doctrine applies in civil cases and provides that we will not impute to the principal knowledge of a fraudulent act in which the agent is engaged against the principal. See Lawrence Sav. Bank v. Levenson, 59 Mass. App. Ct. 699, 705 (2003). Even if this doctrine applies to corporations in Massachusetts in the criminal context, the knowledge of Silva and Araujo, who were not faithless agents, would defeat it.

 Conclusion. Viewed in the light most favorable to the Commonwealth, the grand jury heard sufficient evidence to establish probable cause that Martins committed the crime of labor trafficking in violation of G. L. c. 265, § 51 (a), under a collective knowledge theory. Accordingly, the orders dismissing the labor trafficking indictments are vacated, and the cases are remanded to the Superior Court for proceedings consistent with this opinion.

 So ordered.

FOOTNOTES
[Note 1] Although the indictments name "Martins Maintenance," without "Inc.," the record indicates that it is incorporated. 

[Note 2] The companion cases are against Martins Maintenance, Inc. 

[Note 3] Between the three companion cases, the grand jury returned a total of twenty-five indictments; nine for labor trafficking; eight for failing to pay minimum wage, see G. L. c. 151, §§ 1, 19; and eight for failing to pay overtime, see G. L. c. 151, § 1B. Only the labor trafficking indictments are the subject of this appeal. 

[Note 4] For purposes of the motion to dismiss, Martins conceded at the hearing in the Superior Court that it was the employer or joint employer of Roland. 

[Note 5] Because most of the Martins family share a last name, we refer to them by their first names to avoid confusion. 

[Note 6] The human resource manager reported to Lisa. 

[Note 7] Roland was identified as a Martins employee 198 times in his personnel file. 

[Note 8] Roland frequently "over punched" his time. For example, he punched in for fifteen hours despite being assigned a four hour shift. 

[Note 9] After her visa expired, Roland told S.D. that if she tried to leave, she would be arrested. 

[Note 10] Roland also wore a shirt with the company logo, and received additional shirts in various sizes from the company's human resources director, at his request. 

[Note 11] Silva was also known as Joe DaSilva. 

[Note 12] A company inspection form listed S.D. as the custodian, and the name "Miju" was listed as the custodian on another inspection form. The same forms also listed "Joe" and "Joe Silva" as the account supervisor. 

[Note 13] Pursuant to G. L. c. 265, § 49, "services" are "acts performed by a person under the supervision of or for the benefit of another . . . ." "Forced services" are "services performed or provided by a person that are obtained or maintained by another person who: (i) causes or threatens to cause serious harm to any person; (ii) physically restrains or threatens to physically restrain another person; (iii) abuses or threatens to abuse the law or legal process; (iv) knowingly destroys, conceals, removes, confiscates or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person; (v) engages in extortion under section 25; or (vi) causes or threatens to cause financial harm to any person." 

[Note 14] Corporations have been held criminally liable for an employee's actions. See Commonwealth v. Angelo Todesca Corp., 446 Mass. 128 (2006) (vehicular homicide); Commonwealth v. L.A.L. Corp., 400 Mass. 737 (1987) (sale of alcohol to minors); Commonwealth v. Beneficial Fin. Co., 360 Mass. 188 (1971), cert. denied, 407 U.S. 914 (1972) (bribes to government officials); Commonwealth v. Duddie Ford, Inc., 28 Mass. App. Ct. 426 (1990), S.C., 409 Mass. 387 (1991) (false statements on loan applications). Martins does not argue that corporations cannot be held liable under the labor trafficking statute. 

[Note 15] "Vicarious liability is the 'imposition of liability on one person for the actionable conduct of another, based solely on a relationship between the two persons'" (citation omitted). Berry v. Commerce Ins. Co., 488 Mass. 633, 637 n.3 (2021). Respondeat superior is a type of vicarious liability in the employment and agency context. Id. 

[Note 16] The parties confirmed at oral argument that the indictments against Roland are still pending. 

[Note 17] And with respect to S.D.'s work, it was also done under the supervision of Araujo and Felix. 

[Note 18] "Where criminal liability requires a showing of knowledge only, collective knowledge is an appropriate vehicle of proof." Springfield Terminal Ry. Co., 80 Mass. App. Ct. at 32 n.17. "But where criminal liability requires a showing of intent or recklessness, collective intent or knowledge is not an appropriate vehicle of proof." Id. 

[Note 19] Martins was paid by its clients for cleaning services whether rendered by Roland or one of the victims. The wages paid to Roland by Martins for work done by the victims were "used in the crime." Beneficial Fin. Co., 360 Mass. at 280-281. 

[Note 20] Indeed, Massachusetts effectively outlawed forced labor when it abolished slavery. See art. 1 of the Massachusetts Declaration of Rights. See also, e.g., Commonwealth v. Aves, 35 Mass. 193 (1836), and cases cited. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.