NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13335

COMMONWEALTH  vs.  DAVID CLINTON
(and nine companion cases[1]).


Hampden.     January 4, 2023. - April 27, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Grand Jury.  Practice, Criminal, Grand jury proceedings,
     Indictment.  Probable Cause.  Evidence, Grand jury
     proceedings.  Wanton or Reckless Conduct.  Veteran.
     Nursing Home.  Statute, Construction.  Words, "Caretaker,"
     "Create a substantial likelihood of harm."


Indictments found and returned in the Superior Court
Department on September 24, 2020.

Motions to dismiss were heard by Edward J. McDonough, Jr.,
J.

The Supreme Judicial Court granted an application for
direct appellate review.


Anna E. Lumelsky, Assistant Attorney General (Kevin Lownds,
Assistant Attorney General, also present) for the Commonwealth.
     Jeffrey J. Pyle (John F.X. Lawler & James W. Lawson also
present) for David Clinton.

---

[1] Four against David Clinton, and five against Bennett
Walsh.

William M. Bennett (Meredith G. Fierro also present) for Bennett Walsh.
The following submitted briefs for amici curiae:
Judith M. Flynn for Long Term Care Community Coalition & others.
Nina Loewenstein, of New York, & Tatum A. Pritchard for Disability Law Center.
Anna Richardson for Veterans Legal Services.

WENDLANDT, J.  The grand jury indicted the defendants, Bennett Walsh and David Clinton, the superintendent and medical director of the Soldiers' Home in Holyoke (Soldiers' Home), respectively, for elder neglect in violation of G. L. c. 265, § 13K (d 1/2) (elder neglect statute), in connection with their alleged failure to provide treatment or services to the veterans there housed.  The grand jury heard testimony that, seventeen days after the Governor declared a state of emergency in the Commonwealth because of the COVID-19 pandemic, these decision makers directed their staff to consolidate two floors of elderly veterans, some of whom had dementia, onto one floor.  Forty-two disabled veterans, five of whom were named in the indictments (named veterans), were crowded into a locked space designed to house at most twenty-five patients.  As one witness told the grand jury, there were "bodies on top of bodies."  "[T]ightly packed together and sick," and "coughing on top of each other," the veterans at this State-run facility were left in their "johnnies," were placed in beds less than two feet apart, and were deprived of adequate hydration and food.  The grand jury

heard that some veterans were nonresponsive; others lay listless, mouths agape.  Those with COVID-19 symptoms intermingled with those without.  Record-keeping was abysmal.  It was, as one witness told the grand jury, "like a war zone."  Three days after the decision to consolidate, as many as ten veterans had died from COVID-19.

The grand jury also heard that the consolidation ran against known infection control protocols.  Medical best practices at the time recommended isolation of patients who were symptomatic from those who were not.  Indeed, we were all being told in the nascent days of the pandemic to remain at a prescribed "social distance" from each other.

And the grand jury were told that this tragedy could have been avoided; the defendants were presented with options that comported with expert advice and infection control guidelines.  Clinton, who absented himself from the Soldiers' Home for his own health, was told by the chief operating officer of a nearby hospital that the hospital stood ready, willing, and able to assist.  The grand jury heard that Walsh received calls from the same hospital official, but he did not return the calls; and he had daily telephone calls with the Secretary of the Department of Veterans' Services (DVS) to discuss the Soldiers' Home's COVID-19 response, yet he hid the mounting staffing crisis and emergence of COVID-19 symptoms within the Soldiers' Home from

the secretary.  Instead, the defendants chose silently to consolidate this vulnerable population together without adequate space or sufficient staffing to care for them.  Because these facts and other information presented to the grand jury constituted probable cause to believe that the defendants violated the elder neglect statute, the Superior Court judge erred in dismissing the indictments.

Of course, sometimes bad things happen for no discernable reason, and no one is to blame.  At any subsequent trial, prosecutors will need to prove their case.  We conclude only that they will have the opportunity to do so.[2]

1.  Background.  We recite the facts presented to the grand jury in the light most favorable to the Commonwealth, see Commonwealth v. Washington W., 462 Mass. 204, 210 (2012), reserving some details for subsequent discussion.

a.  The Soldiers' Home.  At all relevant times, the Soldiers' Home was a State-run facility for eligible veterans[3] in Holyoke, with a long-term care unit and independent living

---

[2] We acknowledge the amicus briefs submitted by the Disability Law Center; the Long Term Care Community Coalition, Dignity Alliance Massachusetts, and the Disability Policy Consortium; and Veterans Legal Services.

[3] To be eligible, veterans must have served 180 days of military service; have served ninety days of military service, one of which was during wartime; have received a purple heart; or have a service-related disability.

spaces. The long-term care unit housed veterans needing assistance with activities of daily life, and provided nursing, medication management, and other services.

In March 2020, about 226 veterans lived in the long-term care unit, which was divided among five care centers.[4] "Care Center 1," which was originally split between two floors ("1 North" and "2 North"), housed patients with memory issues, principally dementia, and was locked from the outside.[5] In March 2020, there were forty to fifty veterans in Care Center 1.

At all relevant times, Walsh was the Soldiers' Home superintendent, the "administrative head of the home," a position he had held since 2016. G. L. c. 6, § 71, repealed by St. 2022, c. 144, § 4. See G. L. c. 115A, § 14, inserted by St. 2022, c. 144, § 66.[6] As superintendent, he was vested with the statutory authority to appoint and remove the medical director of the Soldiers' Home. G. L. c. 6, § 71. See G. L. c. 115A, § 14 (c). Clinton, who was the medical director, "ha[d] responsibility for medical, surgical[,] and outpatient

---

[4] Soldiers' Home staff were hired for particular care centers, for example, Care Center 1, but would at times be asked to "float," i.e., work temporarily in other care centers.

[5] Veterans in Care Center 1 were typically housed four to a room.

[6] Effective March 1, 2023, G. L. c. 6, § 71, was repealed and replaced by G. L. c. 115A, § 14. Our disposition would be the same with respect to the new statutory language.

facilities," as well as for "mak[ing] recommendations to the superintendent regarding the appointments of all physicians, nurses[,] and other medical staff." G. L. c. 6, § 71. See G. L. c. 115A, § 14 (c). The DVS, which at the time was an agency within the Executive Office of Health and Human Services (EOHHS), oversaw the Soldiers' Home. G. L. c. 6A, § 16, as amended through St. 2018, c. 154, § 4. See G. L. c. 6A, § 105, inserted by St. 2022, c. 144, § 9. In March 2020, the secretary of DVS was Francisco Urena.

b. The COVID-19 outbreak. "On March 10, 2020, the Governor declared a state of emergency to support the Commonwealth's response to the threat of COVID-19." Le Fort Enters., Inc. v. Lantern 18, LLC, 491 Mass. 144, 147 (2023), quoting Committee for Pub. Counsel Servs. v. Chief Justice of the Trial Court (No. 1), 484 Mass. 431, 433, S.C., 484 Mass. 1029 (2020).

On March 17, the Soldiers' Home tested a veteran, HM, for COVID-19 because he was showing respiratory symptoms. HM lived on 1 North and had three roommates. He had a tendency to wander in and out of other people's rooms and the common room. The Soldiers' Home chief nursing officer, Vanessa Lauziere, suggested to Clinton that HM be isolated pending the results of the test; Clinton determined not to do so, stating that isolating HM was a "moot point" because HM was in Care Center 1,

a locked dementia unit that was isolated from the Soldiers' Home's other units.

On March 21, HM's COVID-19 test results showed that he was positive for COVID-19. Lauziere reported the result to Walsh and Clinton. Clinton told Lauziere that HM should be isolated and that other symptomatic veterans should be tested. HM's roommates were moved from HM's room in 1 North to other rooms. Lauziere suggested that HM be moved from 1 North to one of the Soldiers' Home's COVID-19 isolation spaces, but Clinton said that patients in 1 North had already been exposed and that moving a wandering patient out of the locked unit would further compromise the facility. Walsh informed the staff of HM's positive test, and many staff members became concerned.

In the days that followed, as more veterans showed symptoms of COVID-19, staff members absented themselves from work at increasing rates because they either had contracted COVID-19 or feared they would. Clinton quarantined at home for about a week, stating that he had developed respiratory issues on March 21, that he was in a high-risk population due to his age, and that he could work from home. Other doctors also spent less time than usual at the Soldiers' Home because Clinton told them that they were at high risk due to their age and advised them to minimize their time at the facility.

Carl Cameron, the chief operating officer of Holyoke Medical Center (HMC), which was located about a mile from the Soldiers' Home, became concerned following the admission of Soldiers' Home patients to the HMC emergency department.  During the week of March 23, Cameron twice called Walsh to inquire whether the Soldiers' Home required assistance in connection with its COVID-19 response; Walsh did not return Cameron's calls.  Cameron also called Clinton directly on Clinton's cell phone.  During two telephone calls, which likely took place on March 25 and March 26, Clinton told Cameron about the Soldiers' Home's struggle with staff contracting COVID-19.  The grand jury heard testimony that Clinton reported to Cameron that the Soldiers' Home was "okay" and that they were trying to secure additional personal protective equipment (PPE).  Clinton did not indicate that the Soldiers' Home was in "dire straits" regarding staffing, and Cameron did not sense any panic in Clinton's voice.

Nevertheless, Cameron "reiterated to . . . Clinton that if the Soldiers' Home needed help or they wanted to hospitalize veterans, . . . Clinton should reach out to . . . Cameron so that he could help manage the [e]mergency [r]oom."  However, Clinton declined the offer of assistance; importantly, Clinton did not inquire whether he could transfer veterans -- symptomatic or asymptomatic -- to the HMC, and he did not ask

for other types of support from HMC, such as nursing staff or PPE. Cameron did not hear back from Walsh or Clinton after this call.

By March 27, about one day after Cameron volunteered HMC's assistance, the staffing shortage at the Soldiers' Home reached critical levels. On March 27 or one to two days before then, the chief of staff of DVS recommended to Walsh that he contact HMC for assistance. Walsh did not do so.

At some point in March, Urena had instituted 10 A.M. daily telephone calls with Walsh and others to discuss COVID-19-related issues. Walsh provided updates to Urena, including about the preparation of COVID-19 isolation rooms at the Soldiers' Home and HM's COVID-19 test. Walsh told Urena that HM had been isolated from the other veterans while the test was pending, even though HM had not been. At no time before March 27, and even during a call on the morning of March 27, did Walsh disclose to Urena that there was any problem with staffing levels at the Soldiers' Home.

After having been absent for about a week, Clinton returned to the Soldiers' Home on March 27. That morning, Lauziere expressed her alarm about the staffing crisis to EOHHS personnel and suggested that the National Guard be brought in to help. Walsh made a request for National Guard assistance to EOHHS and DVS, which was denied. When Urena heard about the request, he

was "in shock"; Walsh had not mentioned it during their call that morning and had not previously reported any staffing challenges.

c. The consolidation. On March 27, Walsh, Clinton, Lauziere, and others met to discuss the staffing crisis. A proposal was made to address the staffing shortage issues by consolidating the two floors of Care Center 1. Under the plan, approximately forty-six veterans would be placed on one consolidated floor, 1 North, which was designed to hold twenty-five beds. When Lauziere questioned whether consolidation was a viable option, Clinton assured her that it was, reasoning that the two floors were self-contained and that everyone housed there had already been exposed to COVID-19. Neither Walsh nor Clinton raised the possibility of sending veterans to the HMC or other nearby health care facilities, or shared that Cameron had offered that option. According to Lauziere, she would have pursued the option had it been presented to her.

Without knowing about HMC's offer of assistance, Lauziere and others commenced execution of the decision to consolidate the patients onto one floor. Veterans were grouped loosely by COVID-19 status;[7] nine veterans (including the named veterans)

_____

[7] According to Lauziere, the veterans were categorized as follows: veterans who had not been tested or had not experienced any symptoms; veterans who were symptomatic and had

who had been exposed to COVID-19, but had not been tested, and who purportedly were asymptomatic[8] were packed into the dining room. Lauziere, who did not have the requisite authority to consolidate the floors without approval from Walsh and Clinton, disclosed the detailed plan to Walsh, who declined to evaluate it or to review it with Clinton. Walsh knew that there were COVID-19 positive veterans on both floors, but he considered the detailed execution of the plan a medical decision as to which he deferred to Clinton. When a social worker raised concerns about the consolidation plan, the social worker was told that all of the veterans involved had already been exposed to COVID-19.

According to staff members, the situation on 1 North after consolidation was "awful"; there were "bodies on top of bodies" and "[i]t was just everyone sitting right next to each other, just . . . coughing on top of each other," "like a war zone." Some veterans were left unclothed, wearing only their hospital johnnies. The veterans did not wear PPE or masks. Beds and rooms were mislabeled, bearing the wrong veterans' names, and there were insufficient outlets to supply power to each of the veterans' automatic beds, especially in the dining room, which

---

positive COVID-19 test results; symptomatic veterans who had pending results; hospice veterans; and veterans nearing death.

[8] As discussed infra, the Commonwealth's experts testified that some of these veterans were likely symptomatic.

had only one outlet.  After the consolidation, veterans did not receive sufficient medication, food, or fluids.

In terms of infection control, staff testified that there was no protection between the rooms with symptomatic or COVID-19 positive veterans and the dining room; the doors were left open. Staff were not instructed to isolate symptomatic veterans from the asymptomatic veterans in the dining room, or to change PPE between the bedrooms and the dining room.  Veterans of the various rooms, including those who were COVID-19 positive, commingled in the day room and shared the four bathrooms on 1 North.  By March 30, eight to ten veterans at the Soldiers' Home had died from COVID-19.

d.  <u>Arrival of the National Guard</u>.  On March 30, because of the catastrophic conditions at the Soldiers' Home, EOHHS placed Walsh on administrative leave and announced the creation of a command center, led by Valenda Liptak, the then chief executive officer of Western Massachusetts Hospital in Westfield, who assumed Walsh's duties.  The National Guard arrived within a day.

Upon her arrival at the Soldiers' Home, Liptak toured the facility, focusing on 1 North.  She walked through the dining room and saw "confusion," "mayhem," and "disarray."  She saw veterans with respiratory issues and veterans who were "actively dying."  It was not apparent how the veterans had been arranged

from room to room. Some veterans were in beds -- which were less than two feet apart from one another -- and some were wandering. Most veterans were either wearing johnnies or were half-dressed. There were not enough staff members to feed or dress the veterans. Two veterans told her they were hungry. She also immediately noted the inconsistent use of PPE across the staff; some staff members wore masks, gloves, and gowns, while others did not.

The incident commander, who had been a nurse for thirty-five years and toured 1 North with Liptak, described it as an image she would "never forget." She had "never seen anything like [it]." Veterans were "wall to wall" in the common area. Those in the dining room were "tightly packed together and sick"; some were nonresponsive, and some lay on their backs with their mouths open. Cross-contamination, she observed, was everywhere.

The incident commander found no evidence that the veterans were being assessed regularly. The records were incomplete and disorganized. The Soldiers' Home did not have a total count of veterans on 1 North, and the new team did not have accurate information about the whereabouts of certain veterans within the facility. Clinton told them that he and the other doctors had not been going to 1 North because the doctors were considered

"high risk"; instead, nurses were assessing the patients and updating the doctors.

Liptak's team's first concern was the immediate need to "separate and hydrate" the veterans. They consulted infection control specialists, who advised Liptak to find a unit for COVID-19 negative patients, to shut down open kitchens, to encourage more frequent hygiene, and to standardize PPE use. Liptak's team tested every veteran for COVID-19 and then began to separate them based on their test results. Meanwhile, 180 National Guard members focused on hydrating and feeding the veterans.

On April 3, about forty veterans who tested negative were sent to a satellite space at HMC and another twenty were sent to the emergency departments at HMC or Baystate Medical Center (BMC). HMC eventually had three different units dedicated to Soldiers' Home patients. One-half of the veterans who were transferred eventually died from COVID-19.

According to the chief executive officer of HMC, if Walsh or Clinton had indicated that they were experiencing severe staffing shortages or an outbreak, HMC would have been able to accommodate those veterans. The senior director of care management at BMC said that BMC, too, had "plenty of capacity for COVID[-19] patients who needed admission to the hospital" during the week of March 23, when Walsh and Clinton instead

decided to consolidate the veterans, but that she was not aware of anyone from the Soldiers' Home contacting her in mid- to late March asking for help.

e. Expert testimony. The Commonwealth presented the testimony of two experts to the grand jury. Dr. Asif Merchant was the chief of geriatrics and extended care at Newton-Wellesley Hospital, partner at New England Community Medical Services, medical director at a few nursing care facilities, and clinical professor at Tufts School of Medicine. He reviewed the medical records for the nine veterans who were moved to the dining room on 1 North on March 27, as well as the floor plan for the unit, testing results, nursing notes, a patients census, and materials from interviews. He testified that the consolidation of the two floors of Care Center 1, and the aftermath of the consolidation, increased the likelihood of harm to the named veterans because, inter alia, they were placed into a closely packed dining room with other veterans (unnamed veterans), at least three of whom were likely symptomatic.

Dr. Ronald Rosen was the chief of geriatrics at the North Shore Medical Center in Salem and was previously medical director at North Shore Physicians Group Extended Care. Rosen also reviewed the veterans' medical records and other relevant documents; he concluded that at least three of the veterans who were relocated to the dining room per the consolidation plan

were symptomatic of COVID-19 prior to consolidation.  He testified that housing symptomatic individuals with asymptomatic veterans violated basic infection control practices and increased the risk that the named veterans in the dining room would contract COVID-19.  Further details of both experts' testimony are discussed infra.

2.  Procedural history.  In September 2020, the grand jury returned five indictments for elder neglect in violation of the elder neglect statute, G. L. c. 265, § 13K (d 1/2), one for each named veteran, against each defendant.  The defendants filed motions to dismiss the indictments.  A Superior Court judge held a nonevidentiary hearing and dismissed all the charges.[9]  The judge concluded that the record before the grand jury did not support a finding of probable cause that the defendants were "[c]aretaker[s]" as defined in G. L. c. 265, § 13K (a), or that the defendants created a substantial likelihood of harm with respect to the named veterans under G. L. c. 265, § 13K (d 1/2), either by increasing the risk that the named veterans would contract COVID-19 or by causing the named veterans to suffer

---

[9] The grand jury also returned five indictments against each defendant for violation of G. L. c. 265, § 13K (e), alleging that the defendants permitted serious bodily injury to the named veterans; these indictments were also dismissed.  The Commonwealth did not appeal from those dismissals.

dehydration and malnutrition.  The Commonwealth appealed, and we granted its timely application for direct appellate review.

3.  Discussion.  a.  Standard of review.  "In considering a judge's decision to dismiss for lack of sufficient evidence [to support an indictment], we do not defer to the judge's factual findings or legal conclusions."  Commonwealth v. Stirlacci, 483 Mass. 775, 780-781 (2020).  Rather, our review is de novo.  Commonwealth v. Ilya I., 470 Mass. 625, 627 (2015).

Generally, "a 'court will not inquire into the competency or sufficiency of the evidence before the grand jury'" so long as the grand jury have heard sufficient evidence, when viewed in the light most favorable to the Commonwealth, to warrant a person of reasonable caution in believing that the identified defendant has committed each of the elements of the charged offense.  Stirlacci, 483 Mass. at 780, quoting Commonwealth v. Robinson, 373 Mass. 591, 592 (1977).  The "probable cause" standard is a "'considerably less exacting' standard" than proof beyond a reasonable doubt, which is required to support a conviction at trial.  Stirlacci, supra, quoting Commonwealth v. O'Dell, 392 Mass. 445, 451 (1984).

b.  Caretakers.  The elder neglect statute prohibits a "caretaker of an elder or person with a disability" from "wantonly or recklessly commit[ting] or permit[ting] another to commit abuse, neglect or mistreatment upon such elder or person

with a disability."  G. L. c. 265, § 13K (d 1/2).  The defendants contend that the term "caretaker" under the statute applies only to frontline workers, who directly care for elders, and not to administrative decision makers, like themselves.

i.  Decision makers.  In interpreting statutes, "[o]ur primary goal . . . is to effectuate the intent of the Legislature."  Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 331 (2021), quoting Casseus v. Eastern Bus Co., 478 Mass. 786, 795 (2018).

> "[T]he general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated."

Oracle USA, Inc. v. Commissioner of Revenue, 487 Mass. 518, 522 (2021), quoting Commissioner of Revenue v. Gillette Co., 454 Mass. 72, 76 (2009).  As such, "our analysis begins with 'the "principal source of insight into legislative intent"' -- the plain language of the statute."  Patel v. 7-Eleven, Inc., 489 Mass. 356, 362 (2022), quoting Tze-Kit Mui v. Massachusetts Port Auth., 478 Mass. 710, 712 (2018).

> The elder neglect statute defines "[c]aretaker" as

> "a person with responsibility for the care of an elder or person with a disability, which responsibility may arise as the result of a family relationship, or by a fiduciary duty imposed by law, or by a voluntary or contractual duty

> undertaken on behalf of such elder or person with a disability. A person may be found to be a caretaker under this section only if a reasonable person would believe that such person's failure to fulfill such responsibility would adversely affect the physical health of such elder or person with a disability. Minor children and adults adjudicated incompetent by a court of law may not be deemed to be caretakers under this section." (Emphases added.)

G. L. c. 265, § 13K (a).

The term "responsibility" commonly refers to "[t]he quality, state, or condition of being duty-bound, answerable, or accountable." Black's Law Dictionary 1569 (11th ed. 2019). The term "care" means "charge, supervision," as in "responsibility for or attention to health, well-being, and safety," i.e., "under a doctor's care." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/care [https://perma.cc/Q6KX-47YC]. See Black's Law Dictionary, supra at 263 (defining "care" as "[s]erious attention, heed").

Under the elder neglect statute, the "responsibility may arise" in one of the following manners: "as the result of a family relationship, or by a fiduciary duty imposed by law, or by a voluntary or contractual duty undertaken on behalf of such elder or person with a disability." G. L. c. 265, § 13K (a). Moreover, the statute further limits the term "caretaker" by a rule of reasonableness; in particular, "[a] person may be found to be a caretaker . . . only if a reasonable person would believe that such person's failure to fulfill such

responsibility would adversely affect the physical health of such elder or person with a disability."  Id.

Thus, as it pertains to the defendants, a "caretaker" under the statute is an individual who contractually is duty-bound, answerable, or accountable for the health, well-being, and safety of an elder or person with a disability such that a reasonable person would believe that the individual's failure in this regard would adversely affect the physical health of the elder or person with a disability.[10]  Nothing in the plain language limits the term to frontline workers "directly" responsible for the care of an elder or person with a disability.[11]

---

[10] The meaning of the statute is plain; contrary to the defendants' contention, it is not void for vagueness.  See Commonwealth v. St. Louis, 473 Mass. 350, 355 (2015) ("A criminal statute must define the offense in terms that are sufficiently clear to permit a person of average intelligence to comprehend what conduct is prohibited" [quotation and citation omitted]).  "[L]egislative language need not be afforded 'mathematical precision' in order to pass constitutional muster."  Id., quoting Commonwealth v. Reyes, 464 Mass. 245, 249 (2013).  "Caretaker" is sufficiently described and is not a term that sets "a net large enough to catch all possible offenders, and leave[s] it to the courts to step inside and say who could be rightfully detained, and who should be set at large," Reyes, supra, quoting Smith v. Goguen, 415 U.S. 566, 573 n.9 (1974), and therefore it is not void for vagueness.

[11] Our construction of "caretaker" to reach decision makers is consistent with the construction given to similarly worded statutes by our sister jurisdictions.  See, e.g., Estate of Wyatt, 235 Ariz. 138, 140 (2014), quoting Webster's New International Dictionary 338 (3d ed. 1976) ("'Care' is ordinarily understood to mean 'CHARGE, SUPERVISION, MANAGEMENT:

Nevertheless, the defendants maintain that the term is limited to frontline workers, excluding decision makers who (like them) receive a salary and are responsible, ultimately, for the care of an elder or person with a disability. Their argument is grounded in the phrase "[r]esponsibility arising from a contractual duty," as to which the elder neglect statute provides: "it may be inferred that a person who receives monetary or personal benefit or gain as a result of a bargained-for agreement to be responsible for providing primary and substantial assistance for the care of an elder or person with a disability is a caretaker." G. L. c. 265, § 13K (a) (iii). The defendants contend that this phrase further limits "caretakers" to "primary" care providers, which in the health care industry has a specific and distinct meaning -- namely, "a medical professional (such as a general practitioner, pediatrician, or nurse) with whom a patient has initial contact and by whom the patient may be referred to a specialist." Thus, they argue, the

responsibility for or attention to safety and well-being"); Delaney v. Baker, 20 Cal. 4th 23, 26-27 (1999) (elder abuse statute applies to nursing home administrators); Peterson v. State, 765 So. 2d 861, 864 (Fla. Dist. Ct. App. 2000) ("'Caregiver' logically encompasses more than just the person or persons who do the actual physical work of caring for an elderly or disabled adult. It also reaches those who in fact are 'entrusted' with the responsibility for seeing that an elderly or disabled adult is being cared for in a proper and humane manner"); State v. Boone Retirement Ctr., Inc., 26 S.W.3d 265, 274 (Mo. Ct. App. 2000) (affirming elder abuse conviction of nursing home administrator).

term excludes decision makers who do not provide such "primary care" directly to an elder or person with a disability.  We disagree.

To begin, the statute states that a contractual duty "may" be inferred where a person is compensated for providing primary and substantial assistance for the care of an elder or person with a disability.[12]  It does not state that such a duty "may not" arise outside of this context or that such a duty "may only" arise in such circumstances.  By contrast, where the Legislature intended to limit the scope of "caretaker," it did so expressly.  For example, the statute provides that "[m]inor children and adults adjudicated incompetent by a court of law may not be deemed to be caretakers" (emphasis added).  G. L. c. 265, § 13K (a).  See id. ("A person may be found to be a caretaker under this section only if a reasonable person would believe that such person's failure to fulfill such responsibility would adversely affect the physical health of such elder . . ." [emphasis added]).

Given the Legislature's deliberate choice to employ permissive but nonexclusive language in connection with the circumstances pursuant to which a contractual duty may be inferred and its use of mandatory, exclusive language in the

---

[12] The defendants mistakenly contend that this argument was waived.

same statute, we reject the defendants' proposed construction. See Commonwealth v. Dalton, 467 Mass. 555, 559 (2014) ("Where the Legislature grants discretion in some circumstances and denies it in others, the use of the word 'may' contrasted with the words 'may not' simply clarifies where discretion is granted and where it is forbidden . . ."); Fredericks v. Vartanian, 529 F. Supp. 264, 268 (D. Mass. 1981), aff'd, 694 F.2d 891 (1st Cir. 1982) (contrasting "may" in statute with "may . . . only if").

Moreover, the defendants' contention that the phrase "primary and substantial assistance" as used in the statute has the specific and distinct meaning prescribed to it in the health care industry is belied by the statute's use of the same phrase in connection with describing caretaker status arising from a familial relationship. Specifically, in describing when "[r]esponsibility arising from a family relationship" may be inferred, the statute states that

> "a husband, wife, son, daughter, brother, sister, or other relative of an elder or person with a disability is a caretaker if the person has provided primary and substantial assistance for the care of the elder or person with a disability as would lead a reasonable person to believe that failure to provide such care would adversely affect the physical health of the elder or person with a disability" (emphasis added).

G. L. c. 265, § 13K (a) (i). Most such familial caretakers will not fall within the technical definition of primary care providers as that term is used in the health care industry; yet

the Legislature clearly intended to include familial caretakers within its scope.

The defendants' reading of this phrase suffers from an additional flaw. The statute provides that a contractual duty may arise where an individual is contractually obligated "to be responsible for providing primary and substantial assistance for the care of an elder or person with a disability," G. L. c. 265, § 13K (a) (iii); it does not state that only those who contractually agree "to be directly responsible" for such care fall within its scope. Reading such an additional limitation into the statutory language is improper. See Commonwealth v. Newberry, 483 Mass. 186, 195-196 (2019), quoting Commissioner of Correction v. Superior Court Dep't of the Trial Court, 446 Mass. 123, 126 (2006) ("Courts may not read into a statute a provision that the Legislature did not enact, nor 'add words that the Legislature had an option to, but chose not to include'").[13]

---

[13] Our interpretation is consistent with the meaning ascribed to "caretaker" in the Disabled Persons Protection Commission (DPPC) statute, G. L. c. 19C, which also addresses the consequences of abuse of persons with disabilities. See Ciardi v. Hoffman-La Roche, Ltd., 436 Mass. 53, 62 (2002) ("Statutes addressing the same subject matter clearly are to be construed harmoniously so as to give full effect to all of their provisions and give rise to a consistent body of law"). In that statute, "[c]aretaker" is defined as "a disabled person's parent, guardian or other person or agency responsible for a disabled person's health or welfare," G. L. c. 19C, § 1, which has been construed to "include not only direct care providers . . . but also those . . . responsible for arranging or supervising the provisions of care," DPPC Legal Advisory

Contrary to the defendants' suggestion, this does not mean that "caretaker" status applies to anyone in the State chain of command, no matter how attenuated their connection to the provision of care to an elder or person with a disability. As discussed supra, whether an individual is a caretaker is limited by a rule of reasonableness.[14] See G. L. c. 265, § 13K (a) ("A person may be found to be a caretaker under this section only if a reasonable person would believe that such person's failure to fulfill such responsibility would adversely affect the physical health of such elder or person with a disability" [emphasis added]).

Given that the meaning of the term "caretaker" is not ambiguous, we need not examine the legislative history, which in any event does not appear to support the defendants' proposed construction.[15] See Osborne-Trussell v. Children's Hosp. Corp.,

---

Memorandum, Definition of a Caretaker Under M.G.L. c. 19C (rev. Sept. 30, 2017).

[14] This rule, which applies to all "caretakers" under the statute, demonstrates that the defendants' concern that any volunteer or good Samaritan who provides "passing, secondary, or insubstantial assistance" to an elder would be considered a caretaker is unwarranted.

[15] As the Commonwealth notes, the then Attorney General proposed statutory language adding the elder neglect statute, St. 2004, c. 501, § 8, to "more effectively prosecute nursing home supervisors who allow a pattern of abuse and neglect to occur in the homes" (emphasis added). Attorney General Reilly Commends Legislature for Passage of Bill to Protect Elderly,

488 Mass. 248, 254 (2021), quoting Doherty v. Civil Serv. Comm'n, 486 Mass. 487, 491 (2020) ("If the statutory language is clear, 'courts must give effect to its plain and ordinary meaning and need not look beyond the words of the statute itself'" [alteration omitted]).

ii. Caretaker analysis for the defendants. The record before the grand jury supports probable cause that the defendants were caretakers within the meaning of G. L. c. 265, § 13K (a). Each is an individual who contractually is duty-bound, answerable, or accountable for the health, well-being, and safety of an elder or person with a disability such that a reasonable person would believe that the defendants' failure in this regard would adversely affect the physical health of the elder or person with a disability.

Walsh was the "administrative head of the home," with authority to "appoint . . . a medical director, a treasurer and an assistant treasurer." G. L. c. 6, § 71.[16] Clinton, as medical director, had "responsibility for the medical, surgical

Disabled Citizens from Abuse, Neglect, U.S. State News (Jan. 4, 2005).

[16] In support of his conclusion that the superintendent and medical director were not "caretakers," the judge mistakenly relied on a 1970 opinion by the then Attorney General interpreting certain language in G. L. c. 6, § 71, which was removed subsequently by amendment. See St. 1971, c. 623, § 1. It has little bearing on the meaning of the version of the statute at issue in this case or the current statute.

and outpatient facilities and . . . [would] make recommendations to the superintendent regarding the appointments of all physicians, nurses and other medical staff." Id. Walsh had the authority to overrule Clinton's decisions. Lauziere reported to both defendants, evidencing their authority to oversee and direct nursing decisions.

Moreover, the defendants authorized the consolidation, indicating that they exercised the authority to control the veterans' care. Walsh provided updates regarding the Soldiers' Home's COVID-19 response to Urena, talking with him daily to discuss COVID-19 protocols and conditions at the Soldiers' Home.[17]

Clinton exercised caretaking authority by, inter alia, rejecting HMC's offers of assistance; participating in the decision to create a COVID-19 isolation space at the Soldiers' Home; deciding not to isolate HM when his COVID-19 test was pending, and then to isolate HM once he tested positive; and supervising doctors who cared for veterans. On this record, the

---

[17] The steps that Liptak immediately took when she replaced Walsh -- assessing the state of the building, convening meetings with infection control experts, organizing a testing and COVID-19 status cohorting regime for veterans, and sending veterans to HMC and BMC -- which were all steps that Walsh could have taken in the weeks and days leading to his replacement, also demonstrated the superintendent's caretaking authority.

grand jury could find that there was probable cause that both defendants were caretakers.

c. Substantial likelihood of harm. The defendants also challenged the grand jury's finding of probable cause that they "create[d] a substantial likelihood of harm" by authorizing the consolidation. General Laws c. 265, § 13K (d 1/2), provides that "[w]hoever, being a caretaker of an elder or person with a disability, wantonly or recklessly commits or permits another to commit abuse, neglect or mistreatment upon such elder or person with a disability, shall be punished." The statute defines "[n]eglect" as "the failure to provide treatment or services necessary to maintain health and safety and which either harms or creates a substantial likelihood of harm" (emphasis added). G. L. c. 265, § 13K (a). The theory presented to the grand jury focused on the evidence that the defendants "created a substantial likelihood of harm" to the named veterans by increasing the risk that the named veterans would contract COVID-19, and by causing the named veterans to become dehydrated and malnourished.

Again, "our analysis begins with 'the "principal source of insight into legislative intent"' -- the plain language of the statute." Patel, 489 Mass. at 362, quoting Tze-Kit Mui, 478 Mass. at 712. To "create" is "to bring into existence," to "cause," or "to produce or bring about by a course of action or

behavior."  Merriam-Webster Online Dictionary, https://www
.merriam-webster.com/dictionary/create [https://perma.cc/N5B5
-BSMM].  The common meaning of "substantial" is "considerable in
quantity," or "significantly great."  Merriam-Webster Online
Dictionary, https://www.merriam-webster.com/dictionary
/substantial [https://perma.cc/RLV8-HHUV].  "Likelihood" refers
to "the chance that something will happen," or "probability."
Merriam-Webster Online Dictionary, https://www.merriam
-webster.com/dictionary/likelihood [https://perma.cc/E6N5-CLMV].
See Commonwealth v. Boucher, 438 Mass. 274, 276 (2002) ("As
commonly used and understood, 'likely' is a word that
encompasses a range of probabilities depending on the specific
context in which it is used.  We conclude that something is
'likely' if it is reasonably to be expected in the context of
the particular facts and circumstances at hand").  Consequently,
to "create[] a substantial likelihood of harm" means to engage
in a course of behavior that produces a considerable chance or
probability that harm will result.

i.  Increased risk that the named veterans would contract
COVID-19.  In the light most favorable to the Commonwealth, the
Commonwealth presented "sufficient facts to warrant a person of
reasonable caution in believing," Stirlacci, 483 Mass. at 780,
quoting Commonwealth v. Levesque, 436 Mass. 443, 447 (2002),
that the defendants' decision to consolidate more than forty

elderly veterans onto one floor designed for approximately one-half that number, and particularly the decision to pack nine veterans into the dining room on that consolidated floor, produced a more considerable chance or probability that the named veterans would contract COVID-19.[18]

Notably, Dr. Merchant testified that the decision to consolidate the floors violated basic infection control guidelines, which provided that patients who are symptomatic or who are suspected to be symptomatic should be separated from patients who are not showing symptoms. Consolidation, Merchant testified, created a "recipe for a higher-risk situation" because each named veteran shared a room with more veterans than before the consolidation, their beds were much closer to one another, veterans wandered in and out of rooms on the floor, staff caring for COVID-19 positive patients came into the dining room, staff did not use PPE correctly, and the veterans on the consolidated floor -- whether they were COVID-19 positive, showed COVID-19 symptoms, or were asymptomatic -- all shared the same bathrooms.

Moreover, Merchant reviewed the medical records of the nine veterans who were moved to the dining room on March 27, and

---

[18] Of course, the defendants should not be held to COVID-19 infection control standards other than the standards applicable at the time they made the decision to consolidate.

opined that, on that day, at least three of the unnamed veterans were likely symptomatic. Placing the named veterans into a closely packed dining room with the symptomatic veterans, Dr. Merchant opined, increased the risk of one or all of the named veterans contracting COVID-19. Three of the named veterans -- GE, RT,[19] and AP -- all tested positive on tests administered on March 31, four days after the consolidation; Merchant concluded that, given the incubation period for COVID-19, all three possibly contracted COVID-19 after being transferred to the dining room.

Dr. Rosen also opined that three of the unnamed veterans were symptomatic before consolidation, and concluded that "cohort[ing]" them with the other veterans in the dining room -- including the named veterans -- went against "not only common sense but basic infection control practices where you try to separate and isolate those that are more likely to be contagious from those that [are not]";[20] in Rosen's view, the consolidation

_____

[19] RT was transferred to HMC on April 11 and passed away.

[20] Dr. Rosen testified:

"[E]ven though all the veterans had been exposed it didn't mean that they had all already contracted COVID[-19]. In fact, we see that two of [the] veterans never tested positive for COVID[-19]. So at that time test results were not available for these veterans. So it just goes against basic principles of infection control[, specifically,] that you have to cohort people based on their risks and your medical decision making."

increased the risk that the named veterans in the dining room would contract COVID-19. Rosen concluded that the dining room was "almost an incubator for COVID[-19]"; beds were placed very close together without barriers between them, staff had insufficient knowledge of or poor access to PPE, doors were open, and residents comingled within the lounge area. The consolidation, Rosen opined, made "a very high-risk situation . . . even more high-risk."

Soldiers' Home staff also testified that consolidation violated known infection control practices and increased the risk that veterans would contract COVID-19. For example, a certified nursing assistant testified that she was "extremely shocked and surprised that they would put more people" on 1 North because it would result in veterans "on top of each other . . . shoulder to shoulder." The state of the floor after consolidation "was the complete opposite of everything [she] learned" in nursing school. Additionally, Liptak testified that she thought consolidation "increas[ed] the odds" that COVID-19 negative veterans would contract COVID-19 by "exposing them to multiple people that were probably already COVID[-19] positive."

The defendants contend that because the record also showed that the veterans housed on the consolidated floor already had been exposed to COVID-19 prior to consolidation, they did not "create" a substantial risk of harm; in their view, the risk of

harm already existed, and any increased risk caused by the consolidation is not covered by the statute.  As set forth supra, however, to "create a substantial risk of harm" requires that the caretaker engage in a course of behavior that produces a more considerable chance or probability that harm will result. This definition does not exclude situations where there is a preexisting risk; the baseline comparator is not limited to hypothetical, risk-free situations existing ex ante.[21]  The inquiry whether the defendants "created" a substantial risk of harm is focused on the defendants' conduct and whether that conduct produced a more considerable chance or probability that harm would result than would have existed in the absence of that conduct.

Indeed, the defendants' construction makes little sense in the context of the provision of care, especially in connection with care for the elderly and patients with disabilities -- a population that is already at risk for multiple health

---

[21] Conduct may be criminalized where it increases an already present risk.  See, e.g., Commonwealth v. Carter, 481 Mass. 352, 362-363 (2019), cert. denied, 140 S. Ct. 910 (2020) (affirming involuntary manslaughter conviction where defendant "creat[ed] a situation where there [was] a high degree of likelihood that substantial harm would result" to her boyfriend by encouraging him to get back into truck filled with carbon monoxide after he had saved himself from suicide attempt); Commonwealth v. Hadley, 78 Mass. App. Ct. 405, 407-410 (2010) (defendant convicted of battery had "created a high degree of likelihood of substantial harm" to victim with serious preexisting medical conditions, including enlarged spleen, by kicking spleen).

conditions.  Here, the record supports probable cause that the defendants' decision to consolidate the veterans on one floor without adequate spacing between patients, which resulted in veterans coughing on each other, and housing symptomatic veterans with asymptomatic veterans, like the named veterans, produced a more considerable chance or probability that harm would result to the named veterans.[22]

ii.  <u>Dehydration and malnourishment</u>.  The defendants' contention that the medical records for the named veterans do not support probable cause that the named veterans were dehydrated or malnourished fares no better.  The record showed that, following consolidation, the veterans' medical records were "incomplete and disorganized," containing only "sparse," "brief" information.  The grand jury were warranted in concluding that the medical records did not tell the complete story of the named veterans.

---

[22] We have recognized that "particularly [for] the elderly . . . , [COVID-19] poses a substantial likelihood of serious illness or death."  <u>Foster</u> v. <u>Commissioner of Correction (No. 1)</u>, 484 Mass. 698, 702, <u>S.C.</u>, 484 Mass. 1059 (2020) and 488 Mass. 643 (2021).  Clinton correctly asserts that prosecutors will need to show, at any subsequent trial, that the decision to consolidate resulted in an increased risk; at this stage, we conclude only that the record supported probable cause that the defendants' consolidation order created that increased risk.

Clinton's contention that two of the named veterans were not harmed by the decision to consolidate is inapposite.  The statute requires <u>only</u> that the consolidation decision created a <u>substantial risk</u> of harm.

The grand jury could rely on the ample testimony that the veterans on the consolidated floor were underfed and dehydrated. One social worker testified that veterans on the consolidated floor were not receiving sufficient hydration or food and that the named veterans were dehydrated and malnourished. When Liptak arrived, two veterans told her they were hungry, and she observed that there was insufficient staff to feed all the veterans on the floor. Indeed, her first priority when she arrived was to "separate and hydrate" the veterans.

Another witness testified that, when he visited his father on March 27, his father was so dehydrated that he did not think his father was receiving any hydration. Together, the information before the grand jury warranted a finding of probable cause that the consolidation produced a more considerable chance or probability that the named veterans would become dehydrated and malnourished. See Stirlacci, 483 Mass. at 780, quoting O'Dell, 392 Mass. at 451 ("Probable cause is a 'considerably less exacting' standard than that required to support a conviction at trial").

d. Wantonly or recklessly. Last, the Commonwealth presented sufficient evidence to support probable cause that, in consolidating the floors, the defendants did so "wantonly or recklessly." G. L. c. 265, § 13K (d 1/2). "Wanton or reckless conduct is 'intentional conduct, by way either of commission or

of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another.'" Commonwealth v. Earle, 458 Mass. 341, 347 (2010), quoting Commonwealth v. Welansky, 316 Mass. 383, 399 (1944). "Wanton or reckless conduct amounts to what has been variously described as indifference to or disregard of probable consequences." Commonwealth v. Godin, 374 Mass. 120, 129 (1977), cert. denied, 436 U.S. 917 (1978), quoting Welansky, supra.

The record before the grand jury showed that consolidation was inconsistent with infection control best practices known in March 2020. Dr. Merchant testified that, although COVID-19 infection control guidance has changed throughout the pandemic, even in March 2020 when the defendants decided to consolidate the veterans, the guidance was to separate patients suspected of having COVID-19 from asymptomatic patients; it was a standard component of "basic infection control guidelines for many diseases." The grand jury also heard testimony that, according to an epidemiologist with the bureau of infectious disease at the Department of Public Health (DPH):

> "[A]s early as March 4[, 2020,] it was firmly accepted among the various guidances [sic] that residents of different COVID[-19] statuses should not be grouped together. This has been firm and consistent guidance from the beginning and [has not] changed since the onset of the pandemic. The guidance has been to create physical

separation between positive patients and asymptomatic patients."

In fact, Clinton apparently recognized the significance of the exposure risk, exercising particular caution with respect to himself and the doctors at the Soldiers' Home; on the same day that HM tested positive for COVID-19, Clinton began quarantining at home for a week because he was in a high-risk population -- like the veterans in his care -- and he advised other doctors to minimize their time at the Soldier's Home as well.  Yet the grand jury heard testimony indicating that, despite protecting himself and fellow doctors against the risk of exposure, Clinton did not employ the same caution towards the veterans.  See Commonwealth v. Carter, 474 Mass. 624, 631 (2016), quoting Commonwealth v. Pugh, 462 Mass. 482, 497 (2012) (conduct was subjectively wanton or reckless if "grave danger to others" was apparent and "defendant . . . chose[] to run the risk rather than alter [his] conduct so as to avoid the act or omission which caused the harm").

The grand jury also heard that determining the available resource in the community was critical, even in March 2020, in planning for infection disease control.  Dr. Rosen testified that, in his opinion, when planning for a surge of the type anticipated in March 2020:

> "One of [the] things you do is you plan out and you go to the community and you utilize all the resources you could

have in the community.  That's what the [Centers for Disease Control] recommended.  So you would contact local hospitals and ask how they can help.  Can they -- do they have any extra [PPE], do they have any extra staff, can they -- can they take other residents[?]  You would contact all your other local nursing homes.  Do you have capacity to help us cohort[?]"

The grand jury also heard testimony that the defendants had options that would have allowed them to conform the veterans' care to the then-existing infection control protocols.  Cameron, the chief operating officer of HMC, called Walsh twice during the week of March 23 and never received a response.

Cameron also called Clinton directly, and over the course of two subsequent telephone calls, Cameron told Clinton that if the Soldiers' Home needed help, or if it wanted to hospitalize veterans, Clinton should contact Cameron.  According to Cameron, Clinton did not accept the offer of assistance; he did not indicate that COVID-19 was a problem at the Soldiers' Home, ask whether he could transfer veterans to HMC, or ask for additional resources from HMC such as nursing help or any PPE.  Moreover, according to the chief executive officer of HMC, if either defendant had indicated that he was experiencing staffing shortages or an outbreak, HMC would have been able to accommodate those veterans seven to eleven days before April 3.  Moving veterans from the Soldiers' Home to HMC, the chief executive officer stated, would have required DPH's approval; that approval, the grand jury were told, was received on the

"same day" as it was requested. BMC, too, had "plenty of capacity for COVID[-19] patients who needed admission to the hospital" during the week of March 23, but BMC did not receive any outreach from the Soldiers' Home before the consolidation. Rather, veterans were not sent to HMC or BMC until April 3.[23]

The grand jury thus heard testimony that would warrant finding probable cause that the defendants had a duty to act in accordance with the infection control practices that the Commonwealth's experts testified to be known by medical professionals in March 2020, and that in declining to pursue available options and instead consolidate the two floors, the defendants engaged in intentional conduct of omission that involved a high degree of likelihood that substantial harm would result. See Earle, 458 Mass. at 347. See also Commonwealth v. Gallison, 383 Mass. 659, 665-666 (1981) (evidence of parent's "inaction in light of her child's vomiting, diarrhea, high

---

[23] The testimony regarding the available alternatives to consolidation, which the defendants did not pursue, was provided by an investigator who interviewed these witnesses. This, of course, did not preclude the grand jury from relying on the investigator's report in issuing the indictments. See Commonwealth v. Stevenson, 474 Mass. 372, 376 (2016), quoting O'Dell, 392 Mass. at 450-451 ("We have consistently and without notable exception held that 'an indictment may be based solely on hearsay'"). At this stage, we do not "inquire into the competency or sufficiency of the evidence before the grand jury," so long as the grand jury "hear[d] sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him . . . for the crime charged" (quotation and citations omitted). Stirlacci, 483 Mass. at 780.

fever, subsequent unconsciousness, and breathing failure," if believed, "would warrant the jury in concluding that the defendant should have been aware and indeed was aware of the increased risk of harm and thus [her] failure to remedy the situation was the kind of conduct which constitutes wanton and reckless conduct" [citation omitted]).[24]

4. Conclusion. Based on the foregoing, we reverse the order allowing the defendants' motions to dismiss.

So ordered.

---

[24] The dissent provides a rough roadmap for the defendants to follow as they marshal a defense that their conduct was not wanton or reckless, excusing the defendants' decisions and inactions as either uninformed or merely negligent conduct in the face of the chaotic realities of the early days of the pandemic. In short, the dissent finds that the defendants did the best they could, given the situation with which they were faced. This, of course, is not the question on appeal. Instead, we are tasked with the question whether the grand jury record supports their finding of probable cause. In doing so, the grand jury were not required to "resolve[] all their doubts" or to weigh the evidence to assess whether it could "sustain a conviction" beyond a reasonable doubt (alteration omitted). Commonwealth v. Arias, 481 Mass. 604, 617-618 (2019), quoting Commonwealth v. Cartright, 478 Mass. 273, 283 (2017). As set forth supra, viewed in the light most favorable to the Commonwealth, the record warrants a person of reasonable caution in believing that the defendants' actions, and inactions, involved a high degree of likelihood that substantial harm would result to the veterans under their care. The record supports the grand jury's finding that the defendants acted in contravention of then-existing infectious disease control protocols and that they failed to pursue then-available options. At this stage, that is all that is required.

LOWY, J. (dissenting, with whom Cypher, J., joins). I agree with the court that that there was probable cause that the defendants were caretakers under the elder neglect statute and that there was sufficient evidence to support a finding of probable cause that the defendants' actions created a substantial likelihood of harm. I dissent because -- even viewed in the light most favorable to the Commonwealth -- there was insufficient evidence before the grand jury to support a finding of probable cause that the defendants acted wantonly or recklessly, as required to support an indictment.

As is often noted, hindsight is an exact science, but the protocols in the early days of the COVID-19 pandemic were anything but. At its core, this prosecution is nothing more than an exercise in assigning blame with the benefit of hindsight. A finding of probable cause that the defendants acted wantonly or recklessly in this case ignores the chaos, uncertainty, and unknowns present during the earliest days of the pandemic. Such a finding also fails to recognize the untenable staffing challenges the Soldiers' Home in Holyoke (Soldiers' Home) faced during this time.

Probable cause "exists where the facts and circumstances . . . [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been . . . committed" (quotation and citation omitted). Commonwealth v.

Coggeshall, 473 Mass. 665, 667 (2016). Context is critical to the probable cause analysis because "[i]n dealing with probable cause . . . we deal with probabilities. These are not technical; they are . . . practical considerations of everyday life, on which reasonable and prudent [people], not legal technicians, act" (emphasis added). Commonwealth v. Arias, 481 Mass. 604, 617 (2019), quoting Commonwealth v. Cartright, 478 Mass. 273, 283 (2017). In this case, we are tasked with evaluating probable cause as to whether the defendants were wanton or reckless while working with many patients whose conditions made isolation extremely difficult, and while simultaneously managing an extraordinarily reduced staff during the early days of a not yet fully understood pandemic.

As noted by the court, "[w]anton or reckless conduct is 'intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another.'" Commonwealth v. Earle, 458 Mass. 341, 347 (2010), quoting Commonwealth v. Welansky, 316 Mass. 383, 399 (1944). "The standard of wanton or reckless conduct is at once subjective and objective . . . ." Welansky, supra at 398. "Whether conduct is wanton or reckless is 'determined based either on the defendant's specific knowledge or on what a

reasonable person should have known in the circumstances.'"[1]
Commonwealth v. Carter, 474 Mass. 624, 631 (2016), S.C., 481
Mass. 352 (2019), cert. denied, 140 S. Ct. 910 (2020), quoting
Commonwealth v. Pugh, 462 Mass. 482, 496 (2012).  "Proof of
[wanton or reckless conduct] requires 'more than a mistake of
judgment or even gross negligence.'"  Commonwealth v. Dragotta,
476 Mass. 680, 686 (2017), quoting Commonwealth v. Michaud, 389
Mass. 491, 499 (1983).  "[I]n all cases, not just those in which
there is a horrific tragedy as there is here, we must look at
the conduct that caused the result to determine whether it was
wanton or reckless, not the resultant harm."  Commonwealth v.
Hardy, 482 Mass. 416, 424 (2019).

The court erroneously concludes that the defendants had
safer options available to them other than consolidation and
that the failure to pursue these options supported a finding of
probable cause that the defendants' actions were wanton or
reckless.  Ante at    .  This conclusion is not supported by the

---

[1] "If based on the objective measure of recklessness, the
defendant's actions constitute wanton or reckless conduct . . .
if an ordinary normal [person] under the same circumstances
would have realized the gravity of the danger."  Commonwealth v.
Carter, 474 Mass. 624, 631 (2016), S.C., 481 Mass. 352 (2019),
cert. denied, 140 S. Ct. 910 (2020), quoting Commonwealth v.
Pugh, 462 Mass. 482, 496-497 (2012).  "If based on the
subjective measure, i.e., the defendant's own knowledge, grave
danger to others must have been apparent and the defendant must
have chosen to run the risk rather than alter [his or her]
conduct so as to avoid the act or omission which caused the
harm."  Carter, supra, quoting Pugh, supra at 497.

evidence. "To constitute wanton or reckless conduct, as distinguished from mere negligence, grave danger to others must have been apparent, and the defendant must have chosen to run the risk rather than alter his conduct so as to avoid the act or omission which caused the harm." Welansky, 316 Mass. at 398. Our cases demonstrate that "because wanton or reckless conduct requires a consideration of the likelihood of a result occurring, the inquiry is by its nature entirely fact-specific." Carter, 474 Mass. at 634. It is "[t]he circumstances of the situation [that] dictate whether the conduct is or is not wanton or reckless." Id.

Because our inquiry is fact specific, the world as we knew it in March 2020 is an essential consideration in this case. We have previously recognized the unknowns and absolute chaos created by the pandemic in the opinions that we issued in real time during what can only be described as a period of turmoil. See, e.g., Foster v. Commissioner of Correction (No. 1), 484 Mass. 698, 702 (2020), S.C., 484 Mass. 1059 (2020) and 488 Mass. 643 (2021) ("Despite a massive, concerted global containment effort, COVID-19 has continued to spread, both around the world and in Massachusetts. Few inhabited places worldwide have been spared . . ." [footnote omitted]); Goldstein v. Secretary of the Commonwealth, 484 Mass. 516, 525-526 (2020) ("We need not dwell long on how dramatically conditions have changed in

Massachusetts since the Governor first announced a state of emergency arising from the COVID-19 pandemic on March 10. All who presently live in the Commonwealth have seen it [and lived it] . . ."); Committee for Pub. Counsel Servs. v. Chief Justice of the Trial Court (No. 1), 484 Mass. 431, 433, S.C., 484 Mass. 1029 (2020) ("The 2020 COVID-19 pandemic has created enormous challenges for every aspect of our communities. . . . Health care workers on the frontlines of the epidemic are coming down with the virus in much higher percentages than others, while surgical masks and other basic protective equipment are in short supply, and hospitals with already close-to-capacity intensive care unit beds confront the possibility of inadequate resources to care for critically ill patients . . . . Everyday life is heavily disrupted . . ."). A finding of probable cause in this case ignores the "practical considerations of everyday life" (citation omitted), Arias, 481 Mass. at 617, at an unprecedented time when in many ways life as we know it was falling apart. The grand jury minutes reviewed as a whole, in the context of the world as we knew it in March 2020, rather than with our current understanding of COVID-19, show that the Commonwealth has failed to demonstrate that the defendants acted with an "indifference to or disregard of [the] probable consequences," Welansky, 316 Mass. at 399, when responding to the outbreak

during the earliest stages of what we now know to be an unprecedented global pandemic.

The court relies on the testimonies of Drs. Ronald Rosen and Asif Merchant and an epidemiologist with the bureau of infectious disease at the Department of Public Health (DPH) to support a finding of probable cause that the consolidation was wanton or reckless. Ante at   . Dr. Rosen testified that, in his opinion, when planning for an outbreak, such as the one that occurred at the Soldiers' Home, health care professionals go out into the community and "contact all your other local nursing homes" and "ask how they can help." Dr. Merchant testified that separating symptomatic and asymptomatic patients constituted "basic infection control guidelines for many diseases." And the epidemiologist testified that, from the beginning of the pandemic, the consistent guidance was that there should be "physical separation between positive patients and asymptomatic patients." While all of this testimony is relevant, its application here, even in the light most favorable to the Commonwealth, is through the perfect lens of hindsight.

At bottom, a finding of probable cause, based in large part on this testimony, disregards the specific "circumstances of the situation" at the Soldiers' Home, and it is those specific circumstances that ultimately dictate whether the consolidation was or was not wanton or reckless. See Carter, 474 Mass. at

634. For one, reliance on this evidence fails to recognize that an extraordinary number of staff members were sick or just refusing to work and that attempts to find more staff were made to no avail. This testimony also discounts the real administrative obstacles to moving veterans to another facility. It further fails to take into account that the defendant David Clinton indicated that the Soldiers' Home was working to obtain additional personal protective equipment (PPE) prior to the consolidation and that the first request for assistance from the National Guard, which was made before the consolidation, was denied.

Perhaps most concerning, this testimony overlooks the practical, ethical, and legal difficulties of treating the facility's dementia patients. Many of the veterans at the Soldiers' Home were dementia patients, and it was common for these patients to wander throughout their respective unit and in and out of other veterans' rooms. And according to the testimony before the grand jury, as a matter of medical ethics, these patients could not be "physically or chemically restrain[ed]." As late as March 26, 2020, DPH confirmed to the Soldiers' Home that it was "not appropriate" to confine veterans with dementia to their rooms, even as an infection control measure. All of these factors are critical to determining whether there was probable cause that under these particular

circumstances the consolidation was wanton or reckless.[2]  See Commonwealth v. Carrillo, 483 Mass. 269, 270 (2019) ("The Commonwealth must introduce evidence showing that, <u>considering the totality of the particular circumstances</u>, the defendant knew or should have known that his or her conduct created a high degree of likelihood of substantial harm . . ." [emphasis added]).

The court also predicates its conclusion on the offer of help from Holyoke Medical Center (HMC), contending that as a result the defendants knew that they had safer options available.  <u>Ante</u> at    .  Review of the grand jury minutes reveals only scant evidence about the content of calls where help was purportedly offered to the Soldiers' Home.  The minimal evidence was presented through an investigator who was not a party to these calls, but nonetheless characterized the calls and pontificated about what would have happened if hypothetical questions had been asked on these calls.

---

[2] Moreover, specifically as to the defendant Bennett Walsh, reliance on this testimony to support a finding of probable cause that he was wanton or reckless ignores the fact that the function of his role was primarily that of an administrator.  He had no medical background or training, and ultimately the decision to consolidate patients was made during a discussion with medical professionals who worked at the Soldiers' Home.  In light of his nonmedical background and reliance on the medical professionals in the building, it is unlikely that Walsh or a reasonable person in his position would know that a high degree of likelihood of substantial harm would result from the merger.

According to the testifying investigator, she spoke to Spiros Hatiras, the chief executive officer of HMC, and Carl Cameron, the chief operating officer at HMC. The investigator testified that Hatiras told her that in the days leading up to the consolidation, Hatiras asked Cameron to reach out to the Soldiers' Home to "prepare [HMC] for potential admissions from the Soldiers' Home." The investigator said Hatiras told her that "he believed [Cameron] eventually did talk to [Clinton]" on "March 24th or March 25th, and the second time on March 26th." According to the investigator's testimony, "Hatiras'[s] understanding [was] that [Cameron] did not learn anything of significance other than that the Soldiers' Home had sick patients." During her grand jury testimony, the investigator was also asked a number of hypothetical questions. One question was whether "[it was] fair to say that" had Hatiras been asked to help accommodate residents before the consolidation, he "would have said, yes, and essentially would have reached out to [the proper authorities needed] to kind of coordinate the whole thing." The investigator responded, "That's correct."

The investigator also testified about her interview with Cameron. She testified that Cameron told her that "he had contact with the Soldiers' Home between . . . March 23rd . . . and March 25th." She stated that Cameron told her his initial telephone calls to both Bennett and Clinton were not immediately

returned, but Cameron said he ultimately spoke to Clinton twice. The investigator testified that Cameron said the first call between him and Clinton occurred around March 25. The investigator -- who, again, was not on the call -- did not testify as to what anybody on the call told her was said. Rather, she characterized the first call as mainly about the Soldiers' Home employees who were becoming sick "as well as any PPE issues."

The investigator then said that "Clinton then reached out to . . . Cameron [a second time] likely on March 26th." The investigator, who was also not a party to this second call, testified that during this second call "Clinton told [Cameron] that the Soldiers' Home [was] having a tough time dealing with staff that was getting sick" and "that the Soldiers' Home was okay and that they were in the process of trying to secure additional PPE." According to the investigator, who I emphasize again was not on the call,[3] Cameron offered to help the Soldiers' Home. However, to the extent that there was an offer for help,

---

[3] The court points out, in regard to the hearsay testimony concerning the telephone calls, that hearsay is admissible in grand jury proceedings. I agree. I point out that the grand jury witness was not on the telephone calls the witness describes, and that this witness pontificates on what the likely content to a hypothetical discussion would have been, as it relates to the weight of the evidence presented.

it was vague and not significantly elaborated upon before the grand jury.

The only information the investigator gave about this offer was that, according to the investigator, Cameron told Clinton "that if the Soldiers' Home needed help or they wanted to hospitalize veterans, [Clinton] should reach out to [Cameron] so that he could help manage the Emergency Room" (emphasis added). In response to a question about how Clinton responded to this undefined offer of help, the investigator did not provide a direct answer. Rather, she testified repeatedly about what Clinton did not say and questions he did not ask. And although she was not a party to the call, the investigator testified that Cameron did not "sense any panic in [Clinton's] voice." Importantly, the investigator never elucidated whether there was a discussion between Cameron and Clinton regarding the actual extent of the help being offered or the relevant government agency approvals that would have been required to move veterans from the Soldiers' Home to HMC.

Ultimately, these calls were, according to the testimony of the investigator, focused on PPE and preparing the HMC emergency room for potential admissions, respectively. To the extent that any help was offered to the Soldiers' Home, it was narrow. The investigator characterized the call as mainly a request for some warning so that Cameron could arrange logistics at the hospital

in the event that individuals were transferred.  Even in the light most favorable to the Commonwealth, this vague, undefined offer cannot be viewed as a readily available panacea to all the problems that the Soldiers' Home faced in the earliest days of the pandemic and, as such, the calls do not support a finding of probable cause that the defendants were wanton or reckless.  In the midst of such pandemonium, the action or lack thereof under these circumstances is a thin reed on which to build a finding of probable cause that the defendants acted wantonly or recklessly.

To the extent that the court relies on the relevant agency approvals to move veterans being granted the "same day" it was requested and that another nearby hospital had the capacity to take veterans, in support of its conclusion, such reliance is misplaced.  <u>Ante</u> at    .  The approvals of which the court speaks were admittedly granted quickly but only after the cavalry had already arrived at the Soldiers' Home in response to the administration's involvement.  Nothing in the record indicates how long it would have taken to cut through the bureaucracy necessary to obtain such approvals were the National Guard not already present at the Soldiers' Home.  Reliance on speedy approval at that late stage also gives no credence to the critical fact that the consolidation only occurred after "reaching out to staffing agencies . . . [and] recent retirees"

to alleviate the staffing shortage had failed and an initial request for assistance from the National Guard on March 27, 2020, was denied.  In other words, it is unconvincing to base a finding of probable cause on the capacity of another nearby hospital and the speed with which approvals were granted after the National Guard arrived especially where the record as a whole demonstrates that before the consolidation there were unsuccessful attempts to alleviate the staffing shortage and an initial request for National Guard assistance was both made and denied.

I recognize that the burden on the Commonwealth at this stage is not an onerous one, and there is no denying that the events that occurred at the Soldiers' Home in March 2020 were a tragedy.  However, because I conclude that there was not sufficient evidence before the grand jury to support probable cause that the defendants acted wantonly or recklessly, the indictments lacked probable cause and were therefore properly dismissed.  See, e.g., Commonwealth v. Stirlacci, 483 Mass. 775, 780 (2020).  This conclusion is evident when we properly consider the totality of the circumstances within the Soldiers' Home created by the avalanche of personnel who called out sick or refused to come to work, the practical difficulties created when dealing with dementia patients, the denial of an initial request for National Guard assistance, and the general

circumstances in the Commonwealth during March 2020. See, e.g., Goldstein, 484 Mass. at 536 (Kafker, J., concurring) ("The COVID-19 pandemic has dramatically changed our current reality, not only in the Commonwealth, but across the globe, and not simply for a month or two").

We owe our best to our soldiers who, now in old age and frail health, face the twilight of their journey. Their service to our nation and the cause of liberty has passed. Their service, however, entitles them to the opportunity to live out their days in comfort and safety. There can be no doubt that what occurred at the Soldiers' Home in March 2020 was a tragedy. And in the face of such tragedy, perhaps hurling blame and subjecting the defendants to imprisonment might salve our conscience. But criminalizing blame will do nothing to prevent further tragedy or help unravel the complex reasons why the responses of the Soldiers' Home and so many nursing homes proved inadequate in the nascent days of the pandemic. Since the testimony in the grand jury failed to constitute probable cause to criminalize such blame, I respectfully dissent.